81 A.3d 1

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Ian CUNNINGHAM, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 12, 2012.

Resubmitted Aug. 13, 2013.

Decided Oct. 30, 2013.

Bradley Steven Bridge, Esq., Defender Association of Philadelphia, John P. Cotter, Esq., Cotter & Miller, Philadelphia, Marsha Levick, Esq., Juvenile Law Center, for Ian Cunningham.

Hugh J. Burns, Jr., Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

## *OPINION*

Justice SAYLOR.

This appeal involves a post-conviction challenge to the imposition of a mandatory sentence of life imprisonment, without the possibility of parole, for a murder committed by a juvenile. Specifically, we are asked to determine whether *Miller v. Alabama*, —— U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012)—which holds that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," *id.* at ——, 132 S.Ct. at 2469—applies retroactively to Appellant's 2002 judgment of sentence, which became final in 2005.

In 1999, Appellant, his codefendant, and two accomplices robbed the occupants of a vehicle at gunpoint. In the course of the robbery, Appellant shot and killed the victim, Daniel Delarge, Jr. At the time, Appellant was seventeen years of age.

In 2002, Appellant was convicted of second-degree murder and related offenses. He received a mandatory sentence of life imprisonment without the possibility of parole, plus a term of imprisonment of 7½ to 15 years. *See* 18 Pa.C.S. § 1102(b); 61 Pa.C.S. § 6137.[1] On direct appeal, the Superior Court

1. Under the Juvenile Act, murder is excluded from the definition of delinquent acts generally adjudicated by juvenile courts. *See* 42 Pa.C.S. §§ 6302, 6322(a). Accordingly, murder prosecutions are commenced in adult criminal court, subject to the potential for transfer to juvenile court, upon an appropriate showing by a defendant. *See id.* § 6322(a).

affirmed; this Court denied Appellant's petition for allowance of appeal; and Appellant did not seek discretionary review in the United States Supreme Court.

Appellant timely filed a post-conviction petition claiming, *inter alia*, that the life-without-parole sentence violated his rights under the Eighth Amendment to the United States Constitution, as extended to the States via the Fourteenth Amendment. As of the initial filing, Appellant relied primarily on *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), which held that the Constitution precludes entry of a judgment of sentence of death for defendants under the age of eighteen at the time of their capital crime or crimes. *See id.* at 578, 125 S.Ct. at 1200. The post-conviction court denied the petition without an evidentiary hearing, and the Superior Court affirmed in a memorandum opinion, concluding that *Roper* had no bearing on life sentences. Appellant filed a petition for allowance of appeal, which was held in abeyance pending the disposition of a petition seeking discretionary review before this Court in *Commonwealth v. Batts*, 79 MAP 2009. The *Batts* case concerns a challenge to the imposition of a mandatory life sentence for crimes committed by a minor asserted on direct appeal.

The United States Supreme Court issued the *Miller* decision in June 2012, rendering Pennsylvania's mandatory scheme of life imprisonment for first- and second-degree murder unconstitutional, as applied to offenders under the age of eighteen at the time of their crimes. Paralleling *Batts* and *Cunningham* in this Court, the federal review implemented by the High Court also encompassed one case in the direct-review chain, *Miller v. Alabama*, No. 10–9646, and another at a post-conviction stage, *Jackson v. Hobbs*, No. 10–9647. In a deeply divided opinion, the United States Supreme Court reversed the affirmance of the judgment of sentence and the affirmance of a denial of post-conviction relief, respectively, by state-level reviewing courts. *See Miller*, —— U.S. at ——, 132 S.Ct. at 2475.

In its reasoning, the *Miller* majority initially explained that its decision turned on proportionality. The Supreme Court

previously has found this concept to be central to the Eighth Amendment's prohibition against cruel and unusual punishment; further, the Court admonished that proportionality is to be assessed "less through a historical prism than according to the evolving standards of decency that mark the progress of a maturing society." *Id.* at ——, 132 S.Ct. at 2463 (citations and internal quotation marks omitted).

In its evolving-standards-of-decency evaluation, the *Miller* majority found two "strands of precedent" to be particularly pertinent. *Id.* The first of these involves the categorical prohibition of certain punishments for specified classes of offenders.[2] The second requires individualized sentencing for defendants facing the death penalty,[3] and, by extension, other of the most serious penalties. *See id.* at ——, 132 S.Ct. at 2466.

■ Based on these lines of authority, the *Miller* majority announced that mandatory life-without-parole sentences, as applied to those under the age of eighteen, offend the Eighth Amendment by preventing sentencing authorities from considering juveniles' "diminished culpability and heightened capacity for change." *Id.* at ——, 132 S.Ct. at 2469; *see also id.* at ——, 132 S.Ct. at 2466 (opining that the "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children"); *id.* at ——, 132

2. *See id.* at ——, 132 S.Ct. at 2463 (citing *Kennedy v. Louisiana,* 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008) (holding that imposing the death penalty for non-homicide crimes violates the Eighth Amendment); *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (banning the execution of mentally retarded individuals); *Roper,* 543 U.S. at 578, 125 S.Ct. at 1200; and *Graham v. Florida,* 560 U.S. 48, 81–82, 130 S.Ct. 2011, 2034, 176 L.Ed.2d 825 (2010) (holding that a life-without-parole sentence violates the Eighth Amendment, when imposed on a juvenile non-homicide offender)).

3. *See id.* at ——, 132 S.Ct. at 2463–64 (citing *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality) (holding that a North Carolina statute requiring a mandatory death sentence for first-degree murder violated the Eighth Amendment), and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality) (invalidating an Ohio statute which limited the range of mitigation which could be considered by the sentencing authority in a capital proceeding)).

S.Ct. at 2467 (observing that "[s]uch mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it"). *See generally* Cara H. Drinan, *Graham on the Ground*, 87 WASH. L. REV. 51, 62 (2012) (observing that the line of decisions including *Miller* reflect what legal scholars have termed a developing "youth is different" jurisprudence). The majority also remarked that its decision requires only that a sentencing authority "follow a certain process" before imposing this harshest possible penalty on a juvenile offender—entailing consideration of the offender's youth and attendant characteristics. *Miller*, —— U.S. at ——, 132 S.Ct. at 2471.[4]

Significantly, for present purposes, the *Miller* majority did not specifically address the question of whether its holding applies to judgments of sentence for prisoners, such as Appellant, which already were final as of the time of the *Miller* decision. As such, the opinion does not set out the principles governing the High Court's retroactivity jurisprudence.

■ Briefly, *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality), delineated a general rule of non-retroactivity for new procedural, constitutional rules announced by the Court, WAYNE R. LAFAVE, JEROLD H. ISRAEL,

---

4. The *Miller* decision subsumes three separate dissenting opinions supported, to various measures, by four Justices, demonstrating, at the very least, that the evolving norms discerned by the majority Justices are not universally shared. *See, e.g., Miller*, —— U.S. at ——, 132 S.Ct. at 2477 (Roberts, C.J., joined by Scalia, Thomas, and Alito, JJ., dissenting) ("Put simply, if a 17-year-old is convicted of deliberately murdering an innocent victim, it is not 'unusual' for the murderer to receive a mandatory sentence of life without parole. That reality should preclude finding that mandatory life imprisonment for juvenile killers violates the Eighth Amendment.").

In a joining concurrence, Justice Breyer, joined by Justice Sotomayor, took the position that the federal constitution requires a determination that the defendant "killed or intended to kill" the victim before the State may seek even discretionary imposition of a life-without-parole sentence. *See Miller*, —— U.S. at ——, 132 S.Ct. at 2475–77 (Breyer, J., concurring). The opinion reflects a concern that strict application of felony-murder and transferred-intent theories may produce an untenable mismatch between culpability and punishment as applied to individuals under the age of eighteen. *See id.*

NANCY J. KING & ORIN S. KERR, 1 CRIM. PROC. § 2.11(e) (3d ed.2012) (relating that *Teague* has been described as establishing a "law at the time" principle),[5] subject to two narrow exceptions. This construct was solidified by the majority decision in *Penry v. Lynaugh*, 492 U.S. 302, 329–30, 109 S.Ct. 2934, 2952–53, 106 L.Ed.2d 256 (1989). As relevant here, the exceptions extend to "rules prohibiting a certain category of punishment for a class of defendants because of their status or offense," *Penry*, 492 U.S. at 330, 109 S.Ct. at 2953,[6] and "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Horn v. Banks*, 536 U.S. 266, 271 n. 5, 122 S.Ct. 2147, 2150 n. 5, 153 L.Ed.2d 301 (2002) (quoting *Saffle*, 494 U.S. at 495, 110 S.Ct. at 1264 (internal quotations omitted)). More recently, in *Schriro v. Summerlin*, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), the High Court appears to have merged the first *Teague* exception with the principle that new *substantive* rules generally apply retroactively. *See id.* at 351–52 & n. 4, 124 S.Ct. at 2522–23 & n. 4. *See generally* Drinan, *Graham on the Ground*, 87 WASH. L.REV. at 66 (explaining that "the Court has shifted its terminology somewhat and has described

**5.** There is no dispute in the present appeal that *Miller* embodies a new constitutional rule. *See Teague* 489 U.S. at 301, 109 S.Ct. at 1070 ("In general . . . a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government" or "was not *dictated* by precedent existing at the time the defendant's conviction became final" (emphasis in original)); *see also Graham v. Collins*, 506 U.S. 461, 467, 113 S.Ct. 892, 898, 122 L.Ed.2d 260 (1993) (explaining that "unless reasonable jurists hearing [a] petitioner's claim at the time his conviction became final 'would have felt compelled by existing precedent' to rule in his favor, we are barred from doing so now" (quoting *Saffle v. Parks*, 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990))). *See generally* LaFave, 1 CRIM. PROC. § 2.11(e) ("Under a long line of *Teague* progeny, any reading of Supreme Court precedent that is more expansive than what was 'dictated' by that precedent—*i.e.*, any reading beyond the narrowest reasonable reading of that precedent—can readily be viewed as a 'new rule.'" (footnote omitted)).

As developed below, however, the litigants differ concerning whether *Miller's* effect is substantive versus procedural.

**6.** The first *Teague* exception also extends to new rules placing certain primary conduct beyond the State's power to punish at all. *See Penry*, 492 U.S. at 330, 109 S.Ct. at 2953.

new rules as 'substantive' when they 'alter[ ] the range of conduct or the class of persons that the law punishes,' rather than describing them as falling within the first of the two non-retroactivity exceptions." (footnotes omitted)).[7]

After *Miller's* issuance, the litigants incorporated their assessments of the decision into their submissions, along with developed arguments concerning its prospective versus retroactive application. It is Appellant's position that the holding in *Miller* applies retroactively to prisoners, such as Appellant, serving mandatory life-without-parole sentences for crimes committed as juveniles, even where they have exhausted their direct appeal rights and are proceeding under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546. According to Appellant, the United States Supreme Court unambiguously sanctioned retroactive application in *Miller*, since it reversed the order of a state appellate court affirming the dismissal of a post-conviction petition in the *Jackson* case. *See Miller*, —— U.S. at ——, 132 S.Ct. at 2475. In this respect, Appellant invokes the admonishment that, "once a new rule is applied to the defendant in the case announcing the rule, evenhanded justice requires that it be applied retroactively to all who are similarly situated." *Teague*, 489 U.S. at 300, 109 S.Ct. at 1070; *see also id.* at 315–16, 109 S.Ct. at 1078 (indicating that "habeas corpus cannot be used as a vehicle to create new

7. One effect of this merger is to solidify, and narrow, the range of matters which may be denominated as substantive. Such limitation may be salutary in terms of enhancing the accessibility and certainty of retroactivity doctrine, *see generally Laudenberger v. Port Auth.*, 496 Pa. 52, 56, 436 A.2d 147, 150 (1981) (remarking, albeit in a different context, that the "attempt to devise a universal principle for determining whether a rule is inherently procedural or substantive in nature has met with little success in the history of our jurisprudence"). It seems problematic, to this author at least, to the degree that it excludes matters which otherwise appear to have a potent substantive dynamic (under the more conventional understanding of the word "substantive").

In this regard, to some degree, modern application of the *Teague* doctrine may be viewed, by some, as more an exercise in (perhaps necessary) line drawing than as a precise demarcation between rules which are innately substantive versus procedural in character, or as an effort to address the treatment of the vast range of rules having both attributes in varying degrees.

constitutional rules of criminal procedure unless those rules would be applied retroactively to *all* defendants on collateral review through one of the two exceptions we have articulated" (emphasis in original)).[8]

Additionally, Appellant emphasizes that several of the decisions in the "strands of precedent" upon which the *Miller* majority relied are applied retroactively. *See, e.g., In re Sparks*, 657 F.3d 258, 262 (5th Cir.2011) (observing that *Atkins, Roper*, and *Graham* each have been held by various courts to be retroactive). Furthermore, it is Appellant's position that *Miller* articulates a rule of substantive law, which, by its nature, is retroactive. *See, e.g.*, Brief for Appellant at 24 ("The new rule announced in *Miller* is substantive, and therefore retroactive, because 'it alters ... the class of persons that the law punishes.'" (quoting *Schriro v. Summerlin*, 542 U.S. at 353, 124 S.Ct. at 2519)). For the same reason, even if *Teague's* general rule of non-retroactivity were relevant in the first instance, Appellant asserts, the *Miller* rule meets the first exception to it.[9]

In response to Appellant's lead argument that the holding in *Jackson* compels retroactive application of *Miller* in collateral

**8.** Appellant also relies upon *Tyler v. Cain*, 533 U.S. 656, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001), as does the Commonwealth. While the majority opinion in *Tyler* contains numerous statements and explanations concerning retroactivity, it arose in the context of the limits on successive habeas corpus petitions imposed by the Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214 (the "AEDPA"). *See Tyler*, 533 U.S. at 660, 121 S.Ct. at 2481. Such enactment substantially curtails the justiciability of serial petitions, subject to a few exceptions, including for claims that "rel[y] on a new rule of constitutional law, *made retroactive* to cases on collateral review *by the Supreme Court*, that was previously unavailable." 28 U.S.C. § 2244(b)(2)(A) (emphasis added).

We find it unnecessary, for purposes of the present appeal, to decipher if, or to what extent, the High Court's statements concerning the effect of the AEDPA upon serial, federal habeas corpus claims impact upon the application of the judicially crafted *Teague* construct as applied in the setting of a state post-conviction petition.

**9.** Notably, while Appellant alludes to the second *Teague* exception in discussing the jurisprudence of the United States Supreme Court, he does not advance any argument that such exception applies to the rule of law announced in *Miller*.

review settings, the Commonwealth observes that the *Miller* Court did not, in fact, reverse Jackson's judgment of sentence. Rather, the Commonwealth explains, the United States Supreme Court reversed only the judgments of the state appellate courts and remanded "for further proceedings not inconsistent with this opinion." *Miller*, —— U.S. at ——, 132 S.Ct. at 2475. As such, the Commonwealth posits that the state could raise a *Teague* bar to the new rule in that case to prevent resentencing.[10] Moreover, the Commonwealth stresses that the *Miller* majority simply did not address retroactivity, and, thus, there simply is no dispositive ruling on the subject. See Brief for the Commonwealth at 14 (citing *Goeke v. Branch*, 514 U.S. 115, 117, 115 S.Ct. 1275, 1276, 131 L.Ed.2d 152 (1995) (explaining that "a court need not entertain the [*Teague* ] defense if the State has not raised it.")).

■ Furthermore, the Commonwealth highlights: *Miller* was decided more than six years after Appellant's judgment of sentence became final and nearly three years after the Superior Court affirmed the denial of post-conviction relief; the *Teague* general rule is one of *non*-retroactivity; and the exceptions to that rule have been construed narrowly by the courts.

In terms of the first *Teague* exception, the Commonwealth vigorously refutes Appellant's contention that *Miller* entirely forecloses any certain category of punishment for juvenile offenders. According to the Commonwealth, *Miller*, by its express terms, "bans nothing," but, rather, concerned only the *manner of determining* whether a particular sentence should be imposed. Brief for the Commonwealth at 16. In this regard, the Commonwealth quotes the *Miller* majority's own depiction of its ruling, as follows:

Our decision *does not categorically bar a penalty for a class of offenders* or type of crime . . . Instead, *it mandates only*

10. As it turns out, the state did not do so in *Jackson*, but, rather, conceded retroactivity. *See Jackson v. Norris*, 2013 Ark. 175, 426 S.W.3d 906 (2013). Given this concession, the Arkansas Supreme Court did not perform a principled *Teague* analysis, which is our task here.

*that a sentencer follow a certain process*—considering an offender's youth and attendant characteristics—before imposing a particular penalty.

*Miller*, —— U.S. at ——, 132 S.Ct. at 2471 (citations omitted; emphasis added); *accord id.* at ——, 132 S.Ct. at 2469 ("[W]e do not consider Jackson's and Miller's alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger."). In the Commonwealth's view, Appellant's assertion of a categorical bar is tantamount to an exercise in "word games," in its admixture of procedural and substantive aspects of schemes imposing mandatory life sentences for certain classes of murder. Brief for the Commonwealth at 18 n. 8.

The Commonwealth also briefly addresses the second *Teague* exception for "watershed rules," stressing, in particular, the repeated admonitions of the High Court that such exception is tightly limited. *See* Brief for the Commonwealth at 14 (citing *Whorton v. Bockting,* 549 U.S. 406, 417–18, 127 S.Ct. 1173, 1181–82, 167 L.Ed.2d 1 (2007) (indicating that, "in the years since *Teague,* we have rejected every claim that a new rule satisfied the requirements for watershed status"), *Schriro v. Summerlin,* 542 U.S. at 352, 124 S.Ct. at 2523 (relating that "it is unlikely that any [watershed rule] ha[s] yet to emerge" (internal citations omitted)), and *Beard v. Banks,* 542 U.S. 406, 417, 124 S.Ct. 2504, 2513–14, 159 L.Ed.2d 494 (2004) ("[I]t should come as no surprise that we have yet to find a new rule that falls under the second *Teague* exception.")).

In terms of Appellant's argument that the retroactive application of cases from the two "strands of precedent" relied upon by the *Miller* majority compels *Miller's* own retrospective application, the Commonwealth regards the contention as "legally incoherent." Brief for the Commonwealth at 15; *see also id.* at 15–16 ("There is no 'strands of precedent' exception to *Teague* [.]"). As to cases within the first strand, the Commonwealth rests on its observation that it is the nature of the rules in issue as *substantive* rules that resulted in retroactive application, whereas, the Commonwealth maintains, the *Miller* rule is purely a procedural one. With regard to the

second strand, the Commonwealth highlights that various cases that require consideration of "the characteristics of a defendant and the details of his offense before sentencing him" are indeed subject to *Teague*. *Id.* at 16; *accord* LaFave, 7 Crim. Proc. § 28.6(e) ("Since *Teague*, the Court has rejected arguments that other procedural requirements for death sentences [should] be applied retroactively.").[11]

It is the Commonwealth's core position that Appellant's claim must be decided under the law as it stood at the time his conviction became final in 2005.

Both parties have presented post-submission communications, with Appellant furnishing copies of recent decisions finding *Miller* to be retroactive, *see, e.g.*, *State v. Ragland*, 836 N.W.2d 107 (Iowa 2013); *Jones v. State*, 122 So.3d 698 (Miss. 2013); *People v. Williams*, 367 Ill.Dec. 503, 982 N.E.2d 181 (2012); *People v. Morfin*, 367 Ill.Dec. 282, 981 N.E.2d 1010 (2012), and the Commonwealth pinpointing decisions finding *Miller* to be non-retroactive, *see, e.g.*, *In re Morgan*, 713 F.3d 1365 (11th Cir.2013); *Chambers v. State*, 831 N.W.2d 311 (Minn.2013); *Craig v. Cain*, No. 12–30035, slip op., 2013 WL 69128; *People v. Carp*, 298 Mich.App. 472, 828 N.W.2d 685 (2012); *Geter v. State*, 115 So.3d 375 (Fla.App.2012). Our review of the legal issues presented is plenary.

11. *See, e.g., Beard v. Banks*, 542 U.S. at 419–20, 124 S.Ct. at 2515 (holding that an Eighth Amendment capital sentencing rule invalidating instructions that prevent some jurors from considering mitigating evidence was new and inapplicable on collateral review per *Teague* ); *Graham v. Collins*, 506 U.S. at 463, 113 S.Ct. at 895 (declining to "decide whether the jury that sentenced [a prisoner] to death was able to give effect, consistent with the Eighth and Fourteenth Amendments, to mitigating evidence of [the prisoner's] youth, family background, and positive character traits," because doing so would require retrospective application of a new rule, contrary to *Teague* ). *See generally Craig v. Cain*, No. 12–30035, slip op., 2013 WL 69128, at *2 (5th Cir. Jan. 4, 2013) (explaining that "the Supreme Court has denied retroactive application of prohibitions against weighing invalid aggravating circumstances in certain circumstances, imposition of a death sentence by a jury that has been led to believe responsibility for determining the appropriateness of a death sentence rests elsewhere, and capital-sentencing schemes that foreclose a jury from considering all mitigating evidence.").

As a threshold matter, we reiterate that Appellant's position that we are obliged to apply *Miller* retroactively is based solely upon retroactivity principles applied by the United States Supreme Court in conjunction with its development of federal constitutional doctrine. This limitation is significant, because the High Court has determined that *Teague* does not limit the authority of state courts to provide remedies for violations deemed non-retroactive under *Teague*. *See Danforth v. Minnesota*, 552 U.S. 264, 282, 128 S.Ct. 1029, 1042, 169 L.Ed.2d 859 (2008).

This Court, however, generally has looked to the *Teague* doctrine in determining retroactivity of new federal constitutional rulings. *See, e.g., Commonwealth v. Hughes*, 581 Pa. 274, 306–10, 865 A.2d 761, 780–82 (2004). Certainly, this practice is subject to potential refinement, since "the *Teague* rule of nonretroactivity was fashioned to achieve the goals of federal habeas while minimizing federal intrusion into state criminal proceedings." *Danforth*, 552 U.S. at 280, 128 S.Ct. at 1041. Accordingly, the *Teague* doctrine is not necessarily a natural model for retroactivity jurisprudence as applied at the state level. *See, e.g., Commonwealth v. Bracey*, 604 Pa. 459, 486, 986 A.2d 128, 144 (2009) (recognizing that "a more sophisticated analysis" may be required on state collateral review in some circumstances); *see also supra* note 7 (alluding to a few potential criticisms of *Teague* and its progeny).

Our present, default practice of proceeding no further than *Teague* requires as a matter of federal constitutional law is, in part, a function of the arguments which have been presented to us, where, as here, the litigants have not provided developed argumentation to assist in the fashioning of any broader retroactivity principles. Moreover, state judges who may be circumspect about evolving normative pronouncements of five of nine Justices—which forcefully are rejected by four others—may be reluctant to apply those standards more broadly than is absolutely required. *Cf. Commonwealth v. Sanchez*, 614 Pa. 1, 70, 36 A.3d 24, 66 (2011) (reflecting a reluctance, in the absence of a common law policy or directive from the Pennsylvania General Assembly, to "go further than what is

affirmatively commanded by the High Court" in the implementation of new federal constitutional doctrine).[12]   Thus, litigants who may advocate broader retrospective extension of a new federal constitutional rule would do best to try to persuade this Court both that the new rule is resonate with Pennsylvanian norms *and* that there are good grounds to consider the adoption of broader retroactivity doctrine which would permit the rule's application at the collateral review stage.   In the latter regard, the Court would benefit from recognition and treatment of the strong interest in finality inherent in an orderly criminal justice system,[13] as well as the social policy and concomitant limitations on the courts' juris-

**12.**   Some majority rulings of the United States Supreme Court have espoused the position that "new rules" are not really "new rules" at all, but rather, lie in a sort of inert existence prior to the date of their announcement.  *See, e.g., Danforth*, 552 U.S. at 271, 128 S.Ct. at 1035 ("As we have already explained, the source of a 'new rule' is the Constitution itself, not any judicial power to create new rules of law. Accordingly, the underlying right necessarily pre-exists our articulation of the new rule.").   In our view, however, this sort of originalist philosophy is inconsistent with the "evolving standards" overlay which has been engrafted onto the Eighth Amendment, as reflected in *Miller* and its predecessors.   Conceptually, we are unable to grasp that a specific right which has "evolved" from a source that did not originally contemplate that right—albeit that the source may have allowed for later evolutionary expansion—rationally can be said to have pre-existed the evolutionary process which produced it.   The reluctance to expand new rules announced under the High Court's evolving-standards jurisprudence into the state post-conviction context beyond what is required of this Court may also be explained, partly, in terms of this conceptual difference.   *Cf. generally* Drinan, *Graham on the Ground*, 87 Wash. L.Rev. at 64 (observing that "scholars historically have criticized the U.S. Supreme Court's opaque retroactivity doctrine" (footnote omitted)).

**13.**   *See, e.g., Commonwealth v. Sam*, 597 Pa. 523, 542, 952 A.2d 565, 576 (2008) ("There is absolutely no doubt that there is an enduring societal interest in the finality of criminal proceedings"); *accord Calderon v. Thompson*, 523 U.S. 538, 556, 118 S.Ct. 1489, 1501, 140 L.Ed.2d 728 (1998) ("Only with real finality can the victims of crime move forward knowing the moral judgment will be carried out."); *McCleskey v. Zant*, 499 U.S. 467, 491, 111 S.Ct. 1454, 1468, 113 L.Ed.2d 517 (1991) ("One of the law's very objects is the finality of its judgments."); *Witt v. State*, 387 So.2d 922, 929 (Fla.1980) (opining that emergent, "evolutionary refinements" in criminal law "do not compel an abridgment of the finality of judgments," at the expense of stability, predictability, and manageability of the justice system).

diction and authority reflected in the Post Conviction Relief Act. Because the appellant in this matter has not set an appropriate stage for either pillar of such review, the *Teague* line of analysis remains the appropriate default litmus governing the present appeal.

■ Here, we find the application of this analysis to be fairly straightforward. Initially, we reject Appellant's position that the *Miller* Court's reversal of the state appellate court decision affirming the denial of post-conviction relief in the *Jackson* case compels the conclusion that *Miller* is retroactive. In the first instance, it is not clear that the issue was even placed before the Court, and, as the Commonwealth observes, the Supreme Court need not entertain questions of retroactive application where the government has not raised it. *See Goeke*, 514 U.S. at 117, 115 S.Ct. at 1276; *cf. Carp*, 828 N.W.2d at 713 ("In *Jackson*, because the State did not raise the issue of retroactivity, the necessary predicate for the Court to resolve the question of retroactivity was waived."). Whether the matter was waived or, as the Commonwealth contends, remained available to be asserted on remand is of no moment here, since the United States Supreme Court has made clear enough that *Teague* determinations are not inherently implicit in all new constitutional rulings implemented by that Court. *But see Williams*, 367 Ill.Dec. 503, 982 N.E.2d at 197 (deriving support for the holding that *Miller's* holding is retroactive from its disposition of the *Jackson* case); *Morfin*, 367 Ill.Dec. 282, 981 N.E.2d at 1023 (same). Rather, in the absence of a specific, principled retroactivity analysis by the United States Supreme Court (or a functional equivalent), we do not believe that a *Teague* assessment by subordinate state courts is foreclosed.

We also agree with the Commonwealth that the first *Teague* exception does not apply to the *Miller* rule. Since, by its own terms, the *Miller* holding "does not categorically bar a penalty for a class of offenders," *Miller*, — U.S. at ——, 132 S.Ct. at 2471, (and because it does not place any conduct beyond the State's power to punish at all, *see supra* note 6), it is procedural and not substantive for purposes of *Teague*. *Accord, e.g.,*

*Craig v. Cain,* No. 12–30035, slip op., 2013 WL 69128, at *2 (*"Miller* does not satisfy the test ... because it does not categorically bar all sentences of life imprisonment for juveniles; *Miller* bars only those sentences made mandatory by a sentencing scheme.").[14]

As to the second *Teague* exception, as we have previously noted, Appellant has not developed his arguments in such terms. We will say that, given the high importance attached by the *Miller* majority to the new rule which it discerned, it seems possible that some Justices of the United States Supreme Court may find the rule to be of the watershed variety. *Accord Williams,* 367 Ill.Dec. 503, 982 N.E.2d at 197 (holding that *Miller's* holding qualifies as a watershed rule of criminal procedure under the second *Teague* exception). We doubt, however, that a majority of the Justices would broaden the exception beyond the exceedingly narrow (or, essentially, class-of-one) parameters reflected in the line of decisions referenced by the Commonwealth. *Accord Chambers,* 831 N.W.2d at 311 (concluding that *Miller* does not establish a watershed rule because it focuses exclusively on sentencing and does not alter bedrock procedural elements essential to fairness of a proceeding); *Craig v. Cain,* No. 12–30035, 2013 WL 69128, at *2 (depicting *Miller* as "an outgrowth of the Court's prior decisions that pertain to individualized-sentenc-

14. *See also Morgan,* 713 F.3d at 1367–68 (finding *Miller* to be nonsubstantive because it regulates only the manner of determining the degree of a defendant's culpability); *Chambers,* 831 N.W.2d at 329 (reasoning that the *Miller* rule is procedural, *inter alia,* because it "does not eliminate the power of the State to impose the punishment of life imprisonment without the possibility of release upon a juvenile offender who has committed a homicide offense."); *Geter,* 115 So.3d at 377 ("Clearly and unequivocally, the Supreme Court distinguished between the substantive determinations of a categorical bar prohibiting a 'penalty for a class of offenders or type of crime,' as in *Roper* and *Graham,* and the procedural determination in *Miller* that merely requires consideration of mitigating factors of youth in the sentencing process." (quoting *Miller,* —— U.S. at ——, 132 S.Ct. at 2471)). *See generally* LaFave, 7 Crim. Proc. § 28.6(e) (*"Miller,* unlike other rules applied retroactively under *Teague,* was primarily a procedural, not a substantive decision."). *But see Jones,* 122 So.3d at 701 (finding the *Miller* rule to be substantive in character); *Morfin,* 367 Ill.Dec. 282, 981 N.E.2d at 1022 (same).

ing determinations," rather than a watershed rule broadly impacting fundamental fairness and accuracy in the proceedings). According to the Court, the exception is limited to "sweeping" changes on the order of *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (holding that all indigent defendants charged with felonies are entitled to appointed counsel); modifications of a less broadscale nature, while they may be very important, simply do not require retroactive application, under the second *Teague* exception. *Whorton v. Bockting*, 549 U.S. at 421, 127 S.Ct. at 1183–84 (citations omitted).

■ All Justices of this Court and the United States Supreme Court share the sentiment that "[d]etermining the appropriate sentence for a teenager convicted of murder presents grave and challenging questions of morality and social policy." *Miller*, —— U.S. at ——, 132 S.Ct. at 2477 (Roberts, C.J., dissenting, joined by Scalia, Thomas, and Alito, JJ.). Our role in establishing social policy in the arena is a limited one, however. Here, applying settled principles of appellate review, nothing in Appellant's arguments persuades us that *Miller's* proscription of the imposition of mandatory life-without-out-parole sentences upon offenders under the age of eighteen at the time their crimes were committed must be extended to those whose judgments of sentence were final as of the time of *Miller's* announcement. *See generally Geter*, 115 So.3d at 377 ("Clearly and unequivocally, the Supreme Court distinguished between the substantive determinations of a categorical bar prohibiting a 'penalty for a class of offenders or type of crime,' as in *Roper* and *Graham*, and the procedural determination in *Miller* that merely requires consideration of mitigating factors of youth in the sentencing process." (quoting *Miller*, —— U.S. at ——, 132 S.Ct. at 2471)). *See generally* LaFave, 1 Crim. Proc. § 2.11(e) ("*Teague* has made new rulings very rarely applicable retroactively on habeas review[.]").

The order of the Superior Court is affirmed.

Chief Justice CASTILLE and Justices EAKIN and STEVENS join the opinion.

Chief Justice CASTILLE files a concurring opinion.

Justice BAER files a dissenting opinion in which Justices TODD and McCAFFERY join.

Chief Justice CASTILLE, concurring.

I join the well-reasoned Majority Opinion in its entirety. The question of the retroactive effect of new federal constitutional rules adopted by the U.S. Supreme Court requires a mastery of difficult and often arcane principles. The Majority's cogent and comprehensive accounting of those principles, which makes clear the restrictions upon what actions this Court may undertake in response to this PCRA[1] appeal under existing law and the arguments that have been forwarded here, is convincing. I write separately to express my own view of what, if anything, might be done to mitigate the seeming inequity that is a result of the High Court's ruling in *Miller v. Alabama,* —— U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012). The "seeming inequity" here arises from the fact that the prospect of an individualized, discretionary judicial determination of whether a juvenile murderer should ever be afforded parole eligibility depends solely upon the happenstance of the moment that the defendant's conviction became final.

Prior to *Miller,* there was nothing in Pennsylvania organic law, legislation or decisional law to restrict the legislative power to establish a mandatory sentence of life imprisonment without possibility of parole ("LWOP") as appropriate punishment for a juvenile who commits murder of the first or second degree. That mandatory sentencing scheme as adopted by the General Assembly represented the Commonwealth's policy on the issue. Under *Miller* and by operation of the Supremacy Clause of the U.S. Constitution, that expression of policy can no longer apply going forward. However, as the Majority notes, the *Miller* Court did not address the inevitable aftermath in states, such as Pennsylvania, with an existing (and substantial) roster of defendants currently serving LWOP for murders committed while they were juveniles; some of these

1. Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546.

defendants no doubt have already served decades in prison. *See* Majority Op. at 548, 81 A.3d at 4 ("Significantly, for present purposes, the *Miller* majority did not specifically address the question of whether its holding applies to judgments of sentence for prisoners, such as Appellant, which already were final as of the time of the *Miller* decision. As such, the opinion does not set out the principles governing the High Court's retroactivity jurisprudence.").

The *Miller* Court's silence on retroactivity, combined with the High Court's clear, existing law on retroactivity—ably detailed by the Majority here—suggests that it would require a constitutional decision as innovative as *Miller* itself to divine an existing Eighth Amendment basis for holding that *Miller* is to be afforded retroactive effect of sufficient scope so as to upset judgments that have become final. Any such Eighth Amendment extension of existing federal retroactivity law, in my view, should only come from the U.S. Supreme Court. Given the retroactivity confusion arising in the wake of *Miller*, we may have the definitive federal answer some day.

Moreover, even if there were a stronger case to be made for predicting that the High Court will one day hold that *Miller* applies retroactively to final judgments, this appeal proceeds under the PCRA, and as a PCRA matter, the retroactivity claim is at best premature. *Accord* Majority Op. at 546–57, 81 A.3d at 9 (noting "the social policy and concomitant limitations on the courts' jurisdiction and authority reflected in the Post Conviction Relief Act."). The PCRA's eligibility provisions speak of convictions or sentences resulting from violations of **existing** law. *See* 42 Pa.C.S. § 9543(a)(2). Thus, subsection (a)(2)(vi) speaks of "the imposition of a sentence greater than the lawful maximum." When appellant's sentence was imposed, it was lawful. Appellant's collateral sentencing claim depends upon *Miller* being deemed globally retroactive. The only court that can render a definitive answer on that federal question is the U.S. Supreme Court. Until that Court holds that *Miller* has such an effect, appellant's LWOP sentence cannot be deemed to be one greater than the lawful maximum.

The very structure of the PCRA presupposes that this is the only proper approach. Thus, Section 9545(b) recognizes that new constitutional rights (state or federal) may come into existence after a sentence is final, and indeed, after a defendant's right to PCRA review has been exhausted. The statute allows new constitutional rights to be vindicated, but only after the Court announcing the new right has also held that the right operates retroactively: "the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively." 42 Pa.C.S. § 9545(b)(1)(iii). This safety valve for vindication of new and retroactive rights is logically limited to pronouncements from the two courts of last resort that can recognize new rights and makes clear that the court of last resort announcing the new right should also issue the holding on the retroactivity of the new right. There is nothing irrational in the statute's accommodation of new constitutional rules in this manner. Under the construct, appellant's federal constitutional claim is, at best, premature; and his assumption that this Court can substitute for the U.S. Supreme Court in rendering the retroactivity holding is erroneous, where this Court did not announce the "right" at issue.

Given the dynamism of the U.S. Supreme Court's retroactivity jurisprudence and that Court majority's new emphasis on age as a disqualifying criterion in Eighth Amendment matters (perhaps an emerging "youth is different" view to accompany the Court's "death is different" approach), Mr. Justice Baer's Dissenting Opinion may well be accurate in predicting the High Court's ultimate retroactivity conclusion— notwithstanding the Court's existing precedent on retroactivity and the *Miller* majority's deliberate emphasis of the procedural nature of its holding. The difficulty with implementing the dissent's predictive federal judgment in this PCRA appeal is that the dissent never comes to terms with the PCRA's approach to the vindication of new constitutional rights held to be retroactive.

The resulting landscape in Pennsylvania is ironic: federal *habeas corpus*-based restrictions premised upon respect for state sovereignty and the finality of judgments result in a circumstance that is certainly unusual, if not arbitrary: the longer a juvenile murderer has been in prison, the less likely he is ever to have the prospect of an individualized assessment of whether LWOP was a comparatively appropriate punishment, given his age, other characteristics, and the specifics of his offense (including the degree of the murder) as required by *Miller*. The circumstance is no fault of Pennsylvania, but it is a reality, nevertheless. As the Majority notes, the High Court has recognized that state courts can go further—as a matter of state law—than is commanded by federal law in implementing new federal constitutional rules. *See, e.g., Danforth v. Minnesota,* 552 U.S. 264, 282, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008). But, the Majority properly cautions that a litigant advocating for a broader retroactive application of a federal constitutional rule, as a matter of state law, should attempt to persuade this Court that the broader rule comports with Pennsylvania norms, and accounts for competing concerns, such as the abiding concern with the finality of judgments and the restrictions of the PCRA. No such developed argument for a broader Pennsylvania approach to retroactivity is forwarded and developed here; appellant's position on retroactivity is premised solely upon federal law, and our Court remains properly reluctant to ignore the PCRA's approach to new rights, and to go beyond the affirmative commands of the U.S. Supreme Court, in the absence of a legislative policy directive or some grounded basis in Pennsylvania law. *See Commonwealth v. Sanchez,* 614 Pa. 1, 36 A.3d 24, 66 (2011). *See also Commonwealth v. Bracey,* 604 Pa. 459, 986 A.2d 128, 146–47 & n. 19 (2009) (states that have recognized right to jury determination of mental retardation generally have done so by statute; *Danforth*-based claim that state court might provide more protection than federal courts waived).

Because the PCRA addresses and accommodates claims premised upon new constitutional rights that are in fact of

retroactive effect, appellant's federal claim is not particularly difficult: the claim is premature. What is of more concern to me is the Pennsylvania consequence of the *Miller* decision—if the decision is ultimately deemed not to be retroactive by the U.S. Supreme Court. That circumstance may pose more difficult questions of state constitutional law which, it would appear, fall outside the auspices of the PCRA. As noted, the U.S. Supreme Court has held that state courts may, as a matter of state law, afford greater retroactive effect to new federal constitutional rights than is commanded by the High Court. However, for prisoners whose sentences are final, the PCRA offers no avenue to pursue that argument. New rules and rights are more properly the province of preservation and presentation in the direct review process; and Section 9545 of the PCRA provides a safety valve for collateral relief only after a new right has been held to be retroactive.

There is no Pennsylvania constitutional difficulty with this paradigm restricting the extension of new federal rights: nothing in the Pennsylvania Constitution confers a right to the broadest possible interpretation and extension of those rights. However, a new federal rule, if sufficiently disruptive of state law—such as by requiring the state to treat identically situated defendants differently—may pose an issue of Pennsylvania constitutional law independent of the federal rule. But, in what manner could such a state constitutional claim be vindicated? The state constitutional claim cannot be pursued via direct review because, by definition, the aggrieved defendants have already exhausted their direct appeals. Nor does it appear that the PCRA provides an avenue to articulate and seek vindication of a novel state constitutional claim arising from the effect of a new and disruptive federal rule.

I offer the following tentative thoughts upon the prospects of other methods of remedying the seeming inequity arising in the post-*Miller* landscape. First, it is notable that the General Assembly acted quickly in the wake of *Miller* to address new cases involving sentencing for juvenile murderers, *see* 18 Pa.C.S. § 1102.1. The General Assembly made a policy judgment about appropriate mandatory minimum terms (before

parole eligibility may arise) for new cases arising after *Miller,* establishing minimum term benchmarks for parole eligibility of twenty-five years and thirty-five years, depending upon the juvenile defendant's age at the time of the offense.[2]  The new statute, however, does not reach the existing class of juveniles, such as appellant, whose mandatory LWOP sentences were automatic and became final before *Miller* was decided.

Presumably, the General Assembly has the power to revise the applicable statutory provisions related to parole, without affecting the underlying judicial judgments in these cases. *Miller's* concern was not with sentences of LWOP for juveniles *per se,* but rather with the absolute, mandatory unavailability of parole irrespective of individualized circumstances that the High Court deemed relevant for juvenile offenders. The restriction on parole opportunities in Pennsylvania is not a function of the Crimes Code, which establishes the appropriate term of a sentence, but rather is dictated by relevant provisions of the Commonwealth's Prisons and Parole Code, specifically those which govern the authority of the Pennsylvania Board of Probation and Parole, 61 Pa.C.S. §§ 6101–6153, and which the General Assembly may certainly amend. *Cf. Myers v. Ridge,* 712 A.2d 791, 795 (Pa.Cmwlth.1998) (General Assembly has power to make changes in terms and conditions of parole;  there is no guarantee against changes in parole laws as long as change does not violate prohibition against *ex post facto* laws).  Revisions to the Parole Code would not affect the underlying judicial judgments in cases such as this; the judgment remains guilt for first- or second-degree murder, and the term remains life in prison.[3]

2.  New Section 1102.1 still authorizes, consistently with *Miller,* a sentence of life imprisonment without parole in appropriate cases.  18 Pa.C.S. § 1102.1(a)(1).

3.  Alternatively, the General Assembly could amend the eligibility provisions of the PCRA, as it did in 1998 with its addition of a provision addressing impediments to extraditing convicted defendants who flee to certain foreign countries.  *See* 42 Pa.C.S. § 9543(c) ("If the petitioner's conviction and sentence resulted from a trial conducted in his absence and if the petitioner has fled to a foreign country that refuses to extradite him because a trial in absentia was employed, the petitioner shall be entitled to the grant of a new trial if the refusing country agrees

Indeed, the General Assembly has amended the Parole Code to account prospectively for the addition of 18 Pa.C.S. § 1102.1 after the *Miller* decision. *See* 61 Pa.C.S. § 6139(a)(3.1) (board shall not be required to consider or dispose of application by an inmate or an inmate's attorney in the case of an inmate sentenced under 18 Pa.C.S. § 1102.1 if parole decision was issued by the board within five years of the date of current application); 61 Pa.C.S. § 6139(a)(3.2) ("Nothing under this section shall be interpreted as granting a right to be paroled to any person, and a decision by the board and its designees relating to a person sentenced under 18 Pa.C.S. § 1102.1 may not be considered an adjudication under 2 Pa.C.S. Chs. 5 Subch. A (relating to practice and procedure of Commonwealth agencies) and 7 Subch. A (relating to judicial review of Commonwealth agency action).").

Again, I stress that the inequitable situation arising in the wake of *Miller*—with respect to individuals in appellant's position—is not the fault of anything in the prior Pennsylvania statutory scheme as it affects final judgments—and *Miller* plainly is a new procedural rule. But, the situation does raise a question of Pennsylvania policy that I respectfully suggest the General Assembly should consider. *See* Majority Op. at 559, 81 A.3d at 11 ("Our role in establishing social policy in the arena is a limited one, however."). The fact that Pennsylvania is not required to go further than new federal law or policy does not mean that the Commonwealth should not do so. There is at least a colorable argument that there are now two classes of sentenced juvenile murderers, for whom the distinguishing factor has nothing to do with their crimes or their circumstances: those with final sentences who can never be

by virtue of this provision to return him and if the petitioner upon such return to this jurisdiction so requests. This subsection shall apply, notwithstanding any other law or judgment to the contrary."). In addition, for this narrow class of prisoners, the PCRA time-bar provisions, which, as stated earlier, recognize an exception for new rules of constitutional law expressly held to be retroactive, could be amended not to require a retroactivity holding, in instances involving this sort of juvenile-specific rule. *See id.* § 9545(b)(1)(iii).

assessed to determine if parole is appropriate, and those going forward who must be so assessed, based on *Miller* factors.[4]

Policy arguments aside, I would further note that the situation resulting from *Miller* is "unusual" in terms of basic fairness and proportionality, but the more relevant constitutional question may be whether the situation is "cruel"? I pose the question that way because the Pennsylvania Constitution's Declaration of Rights prohibits the infliction of cruel punishments, but it does not refer to "unusual" punishments. *Compare* U.S. CONST. amend. VIII (cruel and unusual punishments shall not be inflicted) with PA. CONST. art. I, § 13 (cruel punishments shall not be inflicted). No such state constitutional claim having been developed here, this Court's decision today necessarily does not foreclose an argument premised upon our organic charter.

In *Commonwealth v. Batts,* 620 Pa. 115, 66 A.3d 286 (2013), which was argued along with this case, the Court was faced with the question of how to implement *Miller* in a direct appeal scenario. Appellant Batts and his *amicus* raised a broader "corollary argument that a categorical ban on the imposition of life-without-parole sentences on juvenile offenders is required by Article I, Section 13 of the Pennsylvania Constitution, which prohibits 'cruel punishments.' " *Id.* at 297. Mr. Justice Saylor's unanimous Opinion recognized that the Court had previously held that Article I, Section 13 was coextensive with the Eighth Amendment in several discrete contexts,[5] but that "none of those cases involved juvenile

4. I recognize that there are policy considerations apart from the circumstances of the defendants in these cases. The finality of the LWOP regime gave the victims' families a sense of closure, and *Miller*-style relief would disrupt that expectation. *See* Commonwealth's Brief for Appellee, at 8 n. 4 ("a life-*with*-parole sentence has been likened to 'sentencing the victim and the victim's family, as well.... It's a sort of virtual prison, because ... as long as [the killers] are in jail ... and as long as they come up for parole, we're sharing that sentence with them' ") (quoting Brief of *Amicus Curiae* The National Organization of Victims of Juvenile Lifers in Support of Respondents, at 27, filed in the *Miller* case).

5. *See id.* at 298 n. 5. The *Batts* Court cited *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 967–69 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *abrogated on other grounds by*

offenders, who the Supreme Court has indicated are to be treated differently with respect to criminal punishment." *Id.* at 298 n. 5. The Court also noted that Batts had not provided a "fully developed analysis in accord with *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991)," the seminal case from this Court setting forth the factors to be considered in determining whether a provision of the Pennsylvania Constitution affords broader protections than its federal counterpart, but instead had relied upon the brief of his *amicus* on that point. *Id.* at 297.

Nevertheless, the *Batts* Court weighed the assertion of a separate and categorical state constitutional proscription seriously and engaged the Article I, Section 13 argument on the merits. The Court ultimately deemed the argument for a categorical ban on juvenile LWOP sentences to lack merit noting, *inter alia,* that the "purport of the argument is that this Court should expand upon the United States Supreme Court's proportionality approach, not that it should derive new theoretical distinctions based on differences between the conceptions of 'cruel' and 'unusual.' " 66 A.3d at 298.

The Article I, Section 13 claim considered and rejected in *Batts* focused on juvenile LWOP sentences as a categorical or *per se* matter. The claim to which I write here is very different, as it has to do with the uneven state-law effect that is a necessary byproduct of a non-retroactive decision such as *Miller.* In Article I, Section 13 terms, it may be viewed as a type of proportionality claim. It is also a claim, like the one raised in *Batts,* that has not been considered by this Court before.

*Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385 (2003) (rejecting claim that death penalty was *per se* cruel punishment); *Commonwealth v. 5444 Spruce Street,* 574 Pa. 423, 832 A.2d 396, 399 (2003) (addressing excessive fines provision); and *Jackson v. Hendrick,* 509 Pa. 456, 503 A.2d 400, 404 n. 10 (1986) (addressing prison conditions). The Court had previously recognized that *Zettlemoyer* spoke to a coextensive standard only within the context in which that case was decided, in *Commonwealth v. Means,* 565 Pa. 309, 773 A.2d 143, 151 (2001) (Opinion Announcing the Judgment of Court) (addressing challenge to statute allowing victim impact testimony in penalty phase; recognizing that *Zettlemoyer* holding on coextensive standard was distinguishable because different Article I, Section 13 challenge was involved).

Of course, the U.S. Supreme Court has developed decisional law concerning sentencing proportionality. *See Solem v. Helm,* 463 U.S. 277, 290–292, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) (courts should be guided by objective criteria: (i) gravity of offense and harshness of penalty; (ii) comparison of severity of crimes for which same sentences imposed in same jurisdiction; and (iii) comparison of sentences imposed for commission of same offense in other jurisdictions). To my knowledge, however, this Court has not definitively addressed the appropriate proportionality test under Article I, Section 13. Moreover, even if we had, the potential proportionality/cruelty claim arising in this instance is both unique and peculiar to the states, since it is the very disruptive effect of a federal constitutional decision within a state's borders that raises the issue. In assessing such a claim, this Court, unlike a court determining an Eighth Amendment claim, may rightly be concerned only with comparative and proportional justice within Pennsylvania's own borders, and certainly our review would not have to account for federalism concerns. In short, in this instance, the existing Eighth Amendment standard may not sufficiently vindicate the state constitutional value at issue. *See, generally,* Thomas G. Saylor, *Prophylaxis in Modern State Constitutionalism: New Judicial Federalism and the Acknowledged Prophylactic Rule,* 59 N.Y.U. ANNUAL SURVEY OF AM. L. 283, 309–10 (2003).

Notably, this Court has conducted a separate Article I, Section 13 analysis, even in instances where the Court believed that the governing Pennsylvania standard was coextensive with the federal standard. This was so in *Zettlemoyer,* the first Article I, Section 13 case of any real moment issued by this Court. In *Zettlemoyer,* the defendant argued that imposition of the death penalty was "inevitably" cruel punishment under Article I, Section 13. The Court responded that the same claim, when raised under the Eighth Amendment's proscription against "cruel and unusual" punishments, had been rejected by the U.S. Supreme Court in *Gregg v. Georgia,* 428 U.S. 153, 169, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The Court then summarily concluded that "the rights secured

by the Pennsylvania prohibition against 'cruel punishments' are co-extensive with those secured by the Eighth and Fourteenth Amendments." *Zettlemoyer*, 454 A.2d at 967.[6] The Court's finding of a coextensive standard, however, did not mean that a separate analysis under Pennsylvania law, in applying the standard, was not required. And indeed, the Court went on to independently analyze the claim at some length in light of specific indicators in Pennsylvania history. *Id.* at 967–69.

The Opinion Announcing the Judgment of the Court ("OAJC") in *Commonwealth v. Means*, 565 Pa. 309, 773 A.2d 143 (2001) is to similar effect. The relevant issue in *Means* was whether a statute allowing victim impact evidence at the penalty phase of capital trials violated the Eighth Amendment and/or Article I, Section 13. Under *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the OAJC held the Eighth Amendment claim was meritless. The OAJC then engaged in a full-blown analysis of the issue under Article I, Section 13, pursuant to the *Edmunds* test, ultimately concluding that the legislation was not constitutionally infirm. 773 A.2d at 149–58. And, finally, as noted, the Court in *Batts* engaged in a separate state constitutional analysis; notably, the claim for a broader approach to retroactivity there ultimately failed, in large part, because it sought merely to build upon and expand the existing federal approach, rather than deriving from considerations sufficiently specific to Pennsylvania.

In the absence of legislative action to address the policy question of how to treat juveniles whose mandatory sentences of LWOP became final before *Miller*, I would remain open to considering whether there is a basis in Pennsylvania constitutional law—specifically, under Article I, Section 13—to afford global retroactive effect to *Miller*. *See, e.g., State v. Ragland*, 836 N.W.2d 107 (Iowa 2013) (prisoner brought *Miller*-based challenge to his mandatory LWOP sentence under both U.S.

6. There is no indication that a separate and developed state constitutional analysis was forwarded in Zettlemoyer's brief; notably, the case predated *Edmunds*.

and Iowa Constitutions; no argument made that application of standard under Iowa Constitution was other than that employed by U.S. Supreme Court under Eighth Amendment; in determining to apply *Miller* retroactively, Iowa Supreme Court used federal substantive standard of cruel and unusual punishment while reserving right to apply it in more stringent fashion than federal precedent); *People v. Williams,* 367 Ill.Dec. 503, 982 N.E.2d 181 (1st Dist.2012) (*Miller* applied retroactively to final mandatory LWOP sentence based on arguments grounded in U.S. and Illinois Constitutions).

As noted earlier, I realize that it is not apparent that such a state constitutional claim, arising from the effect of a federal decision, is cognizable under the PCRA.[7] To the extent that is so, however, there is at least some basis in law for an argument that the claim is cognizable via a petition under Pennsylvania's *habeas corpus* statute, found at 42 Pa.C.S. § 6501 *et seq. See, e.g., Commonwealth v. Judge,* 591 Pa. 126, 916 A.2d 511, 518–21 (2007) (since PCRA did not provide remedy for appellant's claim regarding deportation from Canada, which essentially challenged "the continued vitality of his sentence," claim could be raised in a petition for writ of *habeas corpus* ). *See also Coady v. Vaughn,* 564 Pa. 604, 770 A.2d 287, 290–94 (2001) (Castille, J., concurring, joined by Newman, J.) (explaining interrelationship of PCRA and traditional *habeas corpus* ).

Justice BAER, dissenting.

While I find merit in much of the Majority's analysis, I ultimately conclude that *Miller v. Alabama,* —— U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), should apply retroactively to juveniles sentenced to life without parole on timely collateral as well as direct review because I find *Miller* to be an effectively substantive rule. *See Commonwealth v. Batts,* 620 Pa. 115, 66 A.3d 286 (2013) (applying *Miller* to juvenile on

7. On the other hand, this Court on many occasions has noted the need to engage in a broad construction of the PCRA so as to avoid tension with the traditional scope of the writ of *habeas corpus. See, e.g., Commonwealth v. Haun,* 613 Pa. 97, 32 A.3d 697, 702–05 (2011); *Commonwealth v. Cruz,* 578 Pa. 263, 851 A.2d 870, 877–78 (2004).

direct appeal). I am guided by the United States Supreme Court's decision reversing the judgment of the collateral appeal defendant in *Miller* and the High Court's overarching recognition in its development of this area of law that "children are constitutionally different." *Miller*, 132 S.Ct. at 2464.

As my colleagues recognize, the Supreme Court recently held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " *Id.* at 2460. The Majority also observes that the High Court did not explicitly address the retroactive effect of its decision, which reversed the judgments of Evan Miller, a juvenile on direct appeal, and Kuntrell Jackson, a juvenile on collateral appeal.

I fully agree with the Majority's determination that *Miller* represents a new rule for the purpose of determining retroactivity. *See* Maj. Op. at 549 n.5, 81 A.3d at 4, n.5. While it may derive from *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010)(prohibiting life without parole for non-homicide juvenile offenders), *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005)(precluding death sentence for juveniles), and cases requiring individualized sentencing, it is clear that those cases did not announce the bar to mandatory life sentences without parole for juveniles set forth in *Miller*.

Given that *Miller* created a new rule of law, the next logical question is whether the rule announced therein should be applied retroactively to those whose judgments became final prior to its filing. Under the United States Supreme Court precedent discussed below, a retroactivity determination requires consideration of whether the rule is substantive, and therefore retroactive, or procedural, and accordingly prospective, unless subject to an exception.

The Majority astutely characterizes this distinction between new procedural rules and new substantive rules as an exercise in "line drawing" rather than "a precise demarcation between rules which are innately substantive versus procedural in character." Maj. Op. at 550 n.7, 81 A.3d at 5, n.7. Given that

many rules have both procedural and substantive attributes, we have repeatedly observed that the line between procedural and substantive rules in other contexts is "nebulous." *Freed v. Geisinger Medical Center*, 607 Pa. 225, 5 A.3d 212, 226 (2010) (Saylor, J., dissenting); *see also Samuel–Bassett v. Kia Motors America, Inc.*, 613 Pa. 371, 34 A.3d 1, 55–56 (2011)("We recognize that the question of what in particular is substantive and what is procedural is not always clear.").

In addressing the question of retroactivity and the substantive/procedural dichotomy, the Majority properly recounts the development of the law from *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), to *Schriro v. Summerlin*, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). As noted by the Majority, the High Court in *Summerlin* explained that, in general, new rules apply to all criminal cases still pending on direct review, but only apply in limited circumstances to convictions that are already final, such as the final judgment against the PCRA defendant in the case at bar. *Summerlin*, 542 U.S. at 351, 124 S.Ct. 2519; *see also Commonwealth v. Bracey*, 604 Pa. 459, 986 A.2d 128, 141–142 (2009).

Thus, the High Court instructed that new rules apply retroactively to defendants on collateral review when the new rule is a "substantive rule," a term which the Court defined to include "decisions that narrow the scope of a criminal statute by interpreting its terms[,] as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish." *Summerlin*, 542 U.S. at 351–352, 124 S.Ct. 2519 (internal citations omitted).[1] Substantive rules apply retroactively under *Summerlin* "because they necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal or faces a punishment that the law cannot impose upon him." *Id.* at 352, 124 S.Ct. 2519 (internal quotation marks omitted).

1. As noted by the Majority in this case and in *Summerlin,* the Supreme Court had previously categorized the second half of this current explanation of a substantive rule as part of the *Teague* test for the limited number of procedural rules that apply retroactively. *Id.* at 352, n. 4, 124 S.Ct. 2519.

Conversely, the Supreme Court observed that new procedural rules generally do not apply retroactively because they "merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise." *Id.* Given the "speculative connection to innocence," the Court limited the retroactive effect of new procedural rules to "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Id.* (internal quotation marks omitted). Moreover, the Court restricted the concept of "fundamental fairness" to situations where "the likelihood of an accurate conviction is *seriously* diminished." *Id.* (internal quotation marks omitted, emphasis in original).

The Supreme Court noted that while substantive rules alter "the range of conduct or the class of person that the law punishes" or the punishment imposed on a class of persons, procedural rules "regulate only the manner of determining the defendant's culpability." *Id.* at 353, 124 S.Ct. 2519 (emphasis removed). Applying this rubric in *Summerlin,* the Court determined that its prior decision in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), should not apply retroactively because it merely addressed the process of determining a defendant's culpability, specifically that a jury rather than a judge must determine the aggravating factors necessary for a death sentence. It noted that rules allocating decision making authority are "prototypical procedural rules." *Summerlin,* 542 U.S. at 353, 124 S.Ct. 2519.

The Majority in the case at bar provides a supportable analysis of the *Miller* rule's retroactivity under *Summerlin* and *Teague,* concluding that *Miller* has procedural attributes. Indeed, the Supreme Court in Miller distinguished its holding from *Graham* and *Roper* using procedural language, stating that the *Miller* decision did "not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* or *Graham.* Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." *Miller,* 132 S.Ct. at 2471. Moreover, a number

of courts around the country have also found *Miller* to be procedural and not retroactive. *See, e.g., Chambers v. State,* 831 N.W.2d 311 (Minn.2013) (concluding that *Miller* is not retroactive because it was neither a substantive rule nor a watershed rule); *Craig v. Cain,* 2013 WL 69128 (5th Cir. Jan. 4, 2013)(concluding *Miller* not retroactive because it did not create a categorical bar to a penalty and because it was not a watershed rule); *People v. Carp,* 298 Mich.App. 472, 828 N.W.2d 685 (2012)(deeming *Miller* procedural because it altered the manner in which the punishment was imposed); *Geter v. State,* 115 So.3d 375 (Fla.Dist.Ct.App.2012)(concluding *Miller* not retroactive, *inter alia,* because it is a procedural rule and because of the need for finality of sentences).

However, with full appreciation of the intrinsic difficulties and uncertainties of the procedural-substantive dichotomy, I do not find the analysis as "straightforward" as does the Majority. Maj. Op. at 557, 81 A.3d at 9. Rather, I view *Miller's* categorical bar on the mandatory imposition of life without parole for juveniles as also containing substantive attributes which would require retroactive application. Under the framework of *Summerlin,* I conclude that the High Court in *Miller* made a "constitutional determination[ ] that place[d] particular ... persons ... beyond the State's power to punish." *Summerlin,* 542 U.S. at 351–352, 124 S.Ct. 2519. The rule in *Miller* provides that mandatory life without parole is "a punishment that the law cannot impose upon" juveniles. *Id.* at 352, 124 S.Ct. 2519.

Although the prohibition in *Miller* is not as broad as the clearly retroactive prohibitions of *Roper* (barring capital punishment for juveniles) and *Graham* (prohibiting a sentence of life without parole for juveniles convicted of non-homicide offenses), *Miller* is a categorical prohibition against mandatory life sentences without parole for juvenile offenders. Unlike *Ring,* as analyzed in *Summerlin, Miller* did not allocate the decision making authority from one party to another, but instead defined the limits of the decision making authority. In other words, the *Miller* holding does not address the procedural aspect of "how" the determination is made, but rather

defines "what" the substantive limits of that determination must be.[2]

I additionally recognize that other courts around the nation have applied *Miller* retroactively. *See State v. Ragland,* 836 N.W.2d 107, 115–116 (Iowa 2013) (holding *Miller* retroactive because it mandated a new procedure resulting from "a substantive change in the law" and because of the Supreme Court's application of the new rule to Jackson, the defendant on collateral review); *People v. Morfin,* 367 Ill.Dec. 282, 981 N.E.2d 1010 (2012)(concluding *Miller* is retroactive because it created a new substantive rule, reinforced by Supreme Court's application of *Miller* to Jackson); *People v. Williams,* 367 Ill.Dec. 503, 982 N.E.2d 181 (2012)(concluding *Miller* is retroactive as a "watershed rule" of criminal procedure and recognizing that the Supreme Court reversed the judgment of Jackson); *see also State v. Simmons,* 99 So.3d 28 (La.2012) (remanding for a sentencing hearing under *Miller* ).[3] Additionally, although in *dicta,* a federal district court fervently admonished, "if ever there was a legal rule that should—as a matter of law and morality—be given retroactive effect, it is

**2.** I agree with the Majority that *Miller* does not fit into the *Teague* exception for a "watershed" rule of criminal procedure because that category is limited to rules "implicating the fundamental fairness and accuracy of the criminal proceeding." *Summerlin,* 542 U.S. at 355, 124 S.Ct. 2519. The Supreme Court has additionally noted that "[t]o fall within this exception, a new rule must meet two requirements: Infringement of the rule must seriously diminish the likelihood of obtaining an accurate conviction, and the rule must alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding." *Tyler v. Cain,* 533 U.S. 656, 665, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001) (internal quotation marks and emphasis omitted). The holding in *Miller* has no relation to the accuracy of a juvenile defendant's convictions.

**3.** The Court of Appeals for the Third Circuit recently entered a brief order finding that petitioners before that court had made a *prima facie* showing that *Miller* was retroactive for purposes of the court's grant of authorization to file second or successive *habeas corpus* petitions, which require a showing that the asserted claim relies upon "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2255(h)(2). The court, however, emphasized that the determination was tentative. *In re Pendleton,* 732 F.3d 280, 2013 WL 5486170 (3d Cir.2013).

the rule announced in *Miller*. To hold otherwise would allow the state to impose *unconstitutional* punishment on some persons but not others, an intolerable miscarriage of justice." *Hill v. Snyder*, 2013 WL 364198, \*2 (E.D.Mich. Jan. 30, 2013)(emphasis in original).

Moreover, in resolving the uncertainties abounding in this case, I emphasize that the High Court reversed the judgment of Kuntrell Jackson, the defendant before it on collateral review. Specifically, the Court held:

> By requiring that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory sentencing schemes before us violate this principle of proportionality, and so the Eighth Amendment's ban on cruel and unusual punishment. We accordingly reverse the judgments of the Arkansas Supreme Court and Alabama Court of Criminal Appeals and remand the cases for further proceedings not inconsistent with this opinion.

*Miller*, 132 S.Ct. at 2475. Thus, the Court made no distinction between the collateral review defendant from Arkansas and the direct review defendant from Alabama.

It is implausible that the Supreme Court granted review of these two juvenile life-without-parole cases randomly, just as it was not accidental that this Court chose to address a juvenile on direct review in *Commonwealth v. Batts*, 620 Pa. 115, 66 A.3d 286 (2013), and this case in which a juvenile seeks collateral review. Indeed, while making a different point in dissent, Justice Alito emphasized that the two cases were "carefully selected." *Miller*, 132 S.Ct. at 2489. Therefore, by reversing the lower court's decision as to Jackson and directing further proceedings consistent with its opinion, I find it a fair, if not compelling, inference that the High Court intended to apply the rule to other juveniles on collateral review. Similarly, the Iowa Supreme Court observed, "There would have been no reason for the Court to direct such an outcome if it did not view the *Miller* rule as applying retroactively to

cases on collateral review." *Ragland,* 836 N.W.2d at 116. As noted in *Teague,* "once a new rule is applied to the defendant in the case announcing the rule, evenhanded justice requires that it be applied retroactively to all who are similarly situated." *Teague,* 489 U.S. at 300, 109 S.Ct. 1060.[4]

As Chief Justice Castille articulates in his concurrence, I too am bothered by the "seeming inequity" that "arises from the fact that the prospect of an individualized, discretionary judicial determination of whether a juvenile murderer should ever be afforded parole eligibility depends solely upon the happenstance of the moment that the defendant's conviction became final." Concurring Opinion at 560, 81 A.3d at 11 (Castille, C.J.).[5]

4. While I recognize that the prosecution may not have raised a *Teague* retroactivity argument before the United States Supreme Court in regard to Jackson, the state, upon remand, conceded retroactivity, as noted by the Majority. Maj. Op. at 466–67 n.10, 81 A.3d at 6 n.10. Additionally, the Arkansas Supreme Court agreed with the state that Jackson was "entitled to the benefit of the United State[s] Supreme Court's opinion in his own case." *Jackson v. Norris,* 2013 Ark. 175, 426 S.W.3d 906, 909–10 (2013)

In his concurring opinion, the Chief Justice correctly observes that the High Court did not overtly hold that *Miller* should apply retroactively. Had the Court so held, this case indisputably would have fallen within the PCRA's timeliness exception allowing for the filing of a petition when "the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively." 42 Pa.C.S. § 9545(b)(1)(iii). The Chief Justice applies this section to forbid relief via the PCRA, because the Supreme Court did not speak specifically to the retroactivity question. Concurring Opinion at 561–63, 81 A.3d at 12–13 (Castille, C.J.). I, however, conclude that Section 9545(b)(1)(iii) can be read more broadly to apply to the situation at bar, where, as I view the case, the United States Supreme Court granted relief, *de facto* allowing for the new constitutional rule to be applied retroactively to Jackson on collateral review, even though the Court did not address retroactivity in the text of the opinion. *See Ragland,* 836 N.W.2d at 116 ("There would have been no reason for the Court to direct such an outcome if it did not view the *Miller* rule as applying retroactively to cases on collateral review.").

5. Additionally, while I disagree with the concurrence's conclusion on *Miller's* retroactivity, I concur with its call for an argument framed in terms of the Pennsylvania Constitution or for legislative action to correct the current inequality, in the absence of retroactive application of *Miller* by this Court.

Finally, I am guided by the rationale underlying the holdings in *Miller, Roper*, and *Graham* that "children are constitutionally different from adults for the purpose of sentencing." *Miller*, 132 S.Ct. at 2464. The High Court noted "three significant gaps" between juveniles and adults:

First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. Second, children are more vulnerable ... to negative influences and outside pressures, including from their family and peers; they have limited contro[l] over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievabl[e] deprav[ity].

*Id.* (internal citations and quotation marks omitted). The Court further noted that these "distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Id.* at 2465. The Court additionally prohibited mandatory sentences of life without parole to juveniles because it concluded that the mandatory sentencing scheme violated its prior cases' "requirement of individualized sentencing for defendants facing the most serious penalties." *Id.* at 2460. The Court noted that the mandatory sentence prohibits a judge from "taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." *Id.* at 2467. The Court opined,

Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself— no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores

that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

*Id.* at 2468 (internal citations omitted). These arguments against prohibiting mandatory life sentences without parole apply equally to the juvenile on direct appeal as they do to the juvenile on collateral appeal.

My conclusion that the *Miller* rule should apply retroactively for the various reasons stated, however, should not be interpreted as a suggestion that life without parole should not be imposed on this appellant or any other juvenile murderer. However, the decision should be, at least in this instance, in the discretion of a trial judge observing the facts of the case and the characteristics of the defendant to determine whether life without parole is appropriate. Moreover, the ultimate decision of whether to release the juvenile on parole, if awarded, will rest with the parole board.

Accordingly, I respectfully dissent because I conclude that *Miller* should be applied retroactively to juveniles on collateral review.

Justices TODD and McCAFFERY join this opinion.