J-A27004-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
v.   :
  :
  :
  :
JERRELL M. STEWART   :
  :
Appellant   :   No. 139 MDA 2023

Appeal from the Judgment of Sentence Entered October 19, 2022
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0004058-2008

BEFORE:   LAZARUS, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:         **FILED: AUGUST 6, 2024**

Jerrell M. Stewart appeals from the judgment of sentence, entered in the Court of Common Pleas of Dauphin County, following his conviction for first-degree murder and the imposition of a sentence of life imprisonment without the possibility of parole (LWOP). Because the trial court's sentence was not the product of careful consideration regarding Stewart's youth and his efforts to rehabilitate himself while incarcerated over the past thirteen years, we conclude that the trial court abused its discretion. Therefore, we vacate and remand for resentencing.

On April 20, 2009, a jury convicted Stewart of first-degree murder after he fatally shot the victim two or three times with a .38 caliber handgun. At the time of the offense, Stewart was almost seventeen and one-half years old.

_____

[*] Former Justice specially assigned to the Superior Court.

Stewart was sentenced to a mandatory LWOP sentence and a concurrent aggregate term of 13-48 months' imprisonment on the remaining charges.[1]

On direct appeal, our Court set forth the facts of the case as follows:

This case arises out of Stewart's admitted shooting of victim Charles (Mac) Davenport during an incident in which Davenport assaulted Stewart's friend, Drakkari Brooks, and attempted to [force] him into a vehicle. Events preceding the shooting reflect a significant history of antagonism between the victim and Stewart and Brooks, in part over an automobile that Brooks had obtained as payment for drugs from a third party[] and had customized. On June 5, 2008, the day before the shooting, the victim purportedly stole the vehicle from Brooks, prompting [Brooks] to enlist assistance from Stewart to retrieve it. On the following day, Brooks and Stewart ventured to Davenport's residence and, using Brooks's extra keys, drove the vehicle and its contents away. Among the items in the car were Davenport's cell phone and his gun.

In response to Brooks and Stewart's unannounced reclamation of the car, the victim located Brooks at the home of Stewart's sister, who was also Brooks's paramour. Davenport was somewhat larger than Brooks[2] and, after locating Brooks at the scene of the eventual shooting[,] "dragged, shook, yanked, choked[,] and generally manhandled Brooks," and "continually yelled at Brooks to take him to get his 'shit' back." Trial Court Opinion, 10/15/10, at 17. As Brooks, "scared to death," pleaded for help from the assembling crowd, Davenport pushed him back against his SUV and berated him[,] saying, "is this your truck . . . get in this truck and take me to my stuff, take me to my shit[.]" *Id.* at 4. At that point, Stewart, armed with a .38 caliber handgun, moved behind

_____

[1] Stewart was also charged and convicted of one count each of recklessly endangering another person (1-24 months' imprisonment), 18 Pa.C.S.A. § 2705, and firearms not to be carried without a license (12-24 months' imprisonment). *Id.* at § 6106(a)(1). Those sentences were ordered to run consecutive to each other and concurrent to Stewart's LWOP sentence.

[2] The record reflects that Brooks was approximately 5'9" tall and weighed 150 pounds, while the victim was approximately 6'0" tall and 160 to 170 pounds.

Davenport and, from a short distance[,] fired one or two shots, causing Davenport to spin around and fall to the ground. Although testimony varied on the number and sequence of the shots fired, multiple eyewitnesses reported that[,] as Davenport lay on the ground begging for his life, Stewart stood over him and fired two more shots, one of which lodged in Davenport's torso, and the second of which ricocheted off the ground. Davenport died within minutes from massive internal bleeding; nevertheless, even as his body lay lifeless, Stewart and his sister kicked the fallen Davenport repeatedly, prompting eventual comment in the coroner's report concerning the extent of physical trauma to the body. Following the shooting, Stewart and Brooks fled and were apprehended by police two days later at a local inn. Thereafter, Stewart wrote his paramour from prison urging her not to testify or provide statements to the police concerning her knowledge of his actions.

Following a formal arraignment, Stewart's case proceeded to a [four-day] jury trial before the Honorable Jeannine Turgeon. In its case[-]in[-]chief, the Commonwealth produced multiple eyewitnesses, some of whom testified that the shots Stewart fired were [broken up] into two short cadences separated by a few moments, while others testified that they heard the shots in a single volley. In addition, the Commonwealth called Dr. Wayne K. Ross, the forensic pathologist who performed the autopsy on Davenport's body.

> D[octo]r Ross reported that the bullet shot into the victim's upper[-]right side entered the victim's right chest and actually moved from the back to the front, traveling into the chest and grazing a lung[,] which caused significant bleeding. . . . D[octo]r Ross stated that the second wound to the upper[-]left chest was fired from the victim's back and entered the left side of the victim's chest. D[octo]r Ross described it as moving from back to front, traveling through his left lung, heart[,] and liver. A third shot entered lower on the left side of the victim's chest and abdominal area and travelled through the spleen and lung before severing Davenport's spinal cord. D[octo]r Ross testified that the bullets in the two upper wounds travelled downward and that the bullet in the lower wound was travelling upwards, suggesting that the victim might have been lying on the ground. D[octo]r Ross did not know the order of the shots but said that any one alone would have been fatal.

[Nevertheless, Dr.] Ross testified that the three entrance wounds would be consistent with a scenario where the victim was shot both from behind and while on the ground and that the pathway of the lower wound in particular suggested that the victim was on the ground. D[octo]r Ross also explained that the three wounds into the victim's sides were compatible with someone moving around from side to side. Regarding the lower wound, he stated that it was consistent with a scenario where the person shot is on the ground and rolling around.

Trial Court Opinion, 10/15/10, at 9.

Stewart called two witnesses in his defense but did not testify on his own behalf. Stewart argued that he had acted in defense of Drakkari Brooks and that[,] consequently[,] his use of deadly force was justified. Nevertheless, the jury rejected Stewart's argument and found him guilty as charged. Subsequently, [on April 20, 2009,] Judge Turgeon imposed a sentence of life in prison with concurrent sentences for the remaining offenses.

*Commonwealth v. Stewart*, 570 MDA 2010, *1-4 (Pa. Super. filed May 10, 2011) (unpublished memorandum decision) (citations to notes of testimony omitted).

Stewart filed post-trial motions claiming the verdict was against the weight of the evidence and that there was insufficient evidence to support a first-degree murder conviction because he was justified in shooting the victim. The trial court denied the motions. On March 5, 2010, Stewart filed a petition, pursuant to the Post-Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546, seeking reinstatement of his direct appeal rights. The court granted relief, concluding counsel was ineffective for failing to file a requested direct appeal. On March 29, 2010, Stewart filed a *nunc pro tunc* direct appeal; our Court affirmed his judgment of sentence in May 2011. *See Stewart*, *supra*.

On September 27, 2011, the Pennsylvania Supreme Court denied Stewart's petition for allowance of appeal.

On May 31, 2012, Stewart filed a timely *pro se* PCRA petition. Counsel was appointed and filed an amended PCRA petition challenging the validity of Stewart's LWOP sentence under **Miller v. Alabama**, 567 U.S. 460 (2012), wherein the United States Supreme Court held that "the Eighth Amendment forbids a sentencing scheme that mandates [LWOP] for juvenile offenders." **Id.** at 479. The PCRA court stayed the proceedings pending decisions in cases addressing the constitutionality of juvenile LWOP sentences and whether **Miller** should be applied retroactively to offenders whose judgments of sentence were final at the time **Miller** was decided. **See Cunningham v. Pennsylvania**, 573 U.S. 904 (2014) (denying petition for *certiorari* filed in **Commonwealth v. Cunningham**, 81 A.3d 1, 11 (Pa. 2013), which held **Miller** does not apply to offenders "whose judgments of sentence were final as of the time of **Miller**'s pronouncement").[3] The court also directed that any

_____

[3] Subsequently, the Pennsylvania Supreme Court decided **Commonwealth v. Batts**, 66 A.3d 286 (Pa. 2013) (**Batts I**), which adopted certain age-related factors that a sentencing court must consider in determining the appropriate sentence for juveniles convicted of murder. **See id.** at 297. Further, in **Commonwealth v. Batts**, 163 A.3d 410 (Pa. 2017) (**Batts II**), the Supreme Court concluded that before a trial court could impose a LWOP sentence on a juvenile offender, the Commonwealth was required to provide notice of intent to seek that penalty, and to prove "beyond a reasonable doubt, that the juvenile offender is permanently incorrigible and thus is unable to be rehabilitated." **Id.** at 459. Finally, in **Jones v. Mississippi**, 141 S. Ct. 1307 (2021), the Supreme Court narrowed the holdings in **Miller** and **Montgomery**, opining that it is incumbent upon a sentencing court to invoke
*(Footnote Continued Next Page)*

potential non-LWOP claims that "petitioner and/or [counsel] could have raised in their initial filings" were preserved and "may be raised and fully litigated after the LWOP claim is litigated." Order, 9/4/12.

On January 25, 2016, the Supreme Court decided **Montgomery v. Louisiana**, 577 U.S. 190 (2016), which held that **Miller** announced a new substantive rule of constitutional law that must be applied retroactively on collateral review. **Id.** at 212. On May 25, 2016, the United States District Court for the Middle District of Pennsylvania granted Stewart habeas corpus relief and remanded the case to the trial court for resentencing in accordance with **Miller** and **Montgomery**.

On July 12, 2017, the court ordered Stewart to file an amended/supplemental PCRA petition raising all preserved non-LWOP claims. On August 8, 2018, the PCRA court held a hearing at which Stewart and trial counsel testified. Following the hearing, the PCRA court denied Stewart's remaining non-LWOP-based requests for relief. Stewart subsequently filed an appeal. Our Court affirmed the PCRA court's order denying Stewart relief. **See Commonwealth v. Stewart**, No. 1257 MDA 2020 (Pa. Super. filed July 13, 2021) (unpublished memorandum decision). On August 12, 2021,

---

a discretionary sentencing procedure that "ensures the sentencer affords individualized 'consideration' to, among other things, the defendant's 'chronological age and its hallmark features.'" **See Jones**, **supra** at 1316. Specifically, the **Jones** Court eliminated the requirement that a sentencing judge make a separate factual finding that the defendant is permanently incorrigible before imposing a LWOP sentence on a juvenile offender. **Id.** at 1319-20.

Stewart filed a petition for allowance of appeal which the Pennsylvania Supreme Court denied on October 26, 2021. **See id.**, 470 MAL 2021 (Pa. filed Oct. 26, 2021).

On October 19, 2022, the trial court held a resentencing hearing on Stewart's LWOP sentence, at which the court received victim impact statements from the victim's family members, as well as statements from Stewart and his family members. The court ultimately resentenced Stewart to LWOP.[4] On October 21, 2022, Stewart filed a post-sentence motion, and accompanying memorandum of law, to modify his sentence.[5] Stewart attached a Department of Corrections (DOC) "DC47C" Report, "DC-43" Integrated Correctional Plan, Housing Performance Reports, Inmate Progress Reports, and "Money Smart Program (2016)" and "Pre-Vocational Program (2016)" Certificates of Completion as "Exh[i]bit A" to support his motion. The

---

[4] The court's resentencing order noted that Stewart's sentence "was effective on June 9, 2008[,] and [that Stewart] does have credit from June 9, 2008[,] through today's date [of October 19, 2022]." Order, 10/19/22. The court also ordered restitution to the victim compensation assistance program in the amount of $4,800.00.

[5] In his memorandum of law in support of his post-sentence motion, Stewart noted that the DOC's Classification Summary and Misconduct Record, entered by the Commonwealth as an exhibit for sentencing purposes, did not reflect any of Stewart's rehabilitative efforts since he was imprisoned for first-degree murder. Specifically, the document did not reflect that, since he began serving his current sentence, he had obtained his GED, completed multiple vocational and self-improvement classes, will be graduating with his barber's license, and had worked as a DOC cook. Stewart attached a document to his memorandum of law reporting the academic and vocational objectives Stewart had achieved.

documentation showed that Stewart had completed a "Violence Prevention High Intensity" Program in November 2020, an "OutPatient" Program in October 2009, received an "Above Average" rating in maintaining positive work reports, an overall average rating for positive housing performance reports in 2020 and 2021,[6] and had been misconduct-free for the relevant rating period. The documents also showed[7] that Stewart had been taking various classes in prison (violence prevention, character development, drug and alcohol treatment), obtained his GED in 2011, is a certified peer specialist at the DOC, and was a cook at the DOC. *Id.* at 13-14.

The Commonwealth filed a memorandum opposing Stewart's post-sentence motion, as well as a motion to incorporate Stewart's DOC Classification Summary and Misconduct Record. Following argument, on December 30, 3022, the trial court denied Stewart's post-sentence motion.[8]

---

[6] Housing performance reports rate an inmate based on the following factors: (1) relates well with, and is courteous to, other inmates; (2) is cooperative and courteous to staff; (3) prompt for all line movements and events; (4) obeys written and verbal orders; (5) proceeds directly to and from cell without loitering; (6) refrains from loud behavior in housing unit; (7) gets up on time; (8) maintains good personal hygiene and clean living area, and properly maintains all State property; and (9) follows inmate dress code. *See* DOC Housing Performance Report for Jerrell M. Stewart, 11.21.1 § 3 (PACT), 6/1/20.

[7] The documents were printed on 6/7/21 at 9:38 AM.

[8] The court stated the following in its order denying Stewart's post-sentence motion:

*(Footnote Continued Next Page)*

Stewart filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Stewart raises the following issue for our consideration:

> Was the sentence of life without parole for [Stewart] as he was a juvenile at the time of the crime[,] so clearly unreasonable, and so manifestly excessive that it constitutes an abuse of discretion when the sentencing court focused disproportionately on the nature of the crime and paid lip service to [] Stewart's juvenile status and rehabilitative efforts?

Appellant's Brief, at 6.

Stewart argues that the trial court abused its discretion when it resentenced him to LWOP where the court focused "disproportionately on the brutality of the crime[,] . . . d[id] not consider [his] rehabilitative needs[,] and did not distinguish why this crime's particular characteristics outweighed any

---

> Prior to resentencing this [c]ourt reviewed and considered the trial testimony, the [trial] court opinion on post-sentence motions, [and] the impactful and emotional testimony presented at the resentencing hearing on October 19, 2002[,] from relatives of both [Stewart] and the victim, Charles Davenport. This [c]ourt also reviewed the [DOC]'s Classification Summary and Misconduct Record, which detailed information regarding the murder charge, [Stewart]'s version of the events, his age[,] and institutional adjustment[,] as well as background on his family, social[,] educational, occupational, and mental health/drug and alcohol history.
>
> In consideration of the above-mentioned factors, this [c]ourt is satisfied that the sentence of life imprisonment for the first-degree murder of Charles Davenport was appropriate.

Order, 12/30/22, at 1-2.

consideration of his youth." *Id.* at 17. As a result, Stewart claims this Court should vacate his sentence and remand for resentencing.

An appellant's challenge to the discretionary aspects of his sentence is not appealable as of right. ***Commonwealth v. Leatherby***, 116 A.3d 73, 83 (Pa. Super. 2015). As such, an appellant challenging the sentencing court's discretion must invoke this Court's jurisdiction by: (1) filing a timely notice of appeal; (2) properly preserving the issue at sentencing or in a post-sentence motion; (3) complying with Pa.R.A.P. 2119(f), which requires a separate section of the brief setting forth a concise statement of the reasons relied upon for allowance of appeal of the discretionary aspects of a sentence; and (4) presenting a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b), or sentencing norms. *Id.*

Instantly, Stewart filed a timely notice of appeal, preserved his issue by filing a post-sentence motion, and filed a Rule 2119(f) statement. With regard to whether Stewart has raised a substantial question, a determination that is made on a case-by-case basis, ***Commonwealth v. Moury***, 992 A.2d 162. 170 (Pa. Super. 2010), we conclude that Stewart has raised a substantial question. ***See Commonwealth v. Lekka***, 210 A.3d 343, 351-52 (Pa. Super. 2019) (finding substantial question where appellant averred sentencing court failed to recognize "the extensive evidence that [appellant] presented of his rehabilitation during his years in prison"); ***Commonwealth v. Lamonda***, 52 A.3d 365, 371 (Pa. Super. 2012) (finding substantial question where

sentencing court focused on gravity of offense); ***Commonwealth v. Schroat***, 272 A.3d 523, 530 (Pa. Super. 2022) (trial court abused its discretion by imposing LWOP resentence on appellant where sentence lacked "consideration of [a]ppellant's youth, history, and rehabilitative needs in favor of an inordinate focus on the heinous act he committed as a minor [and a]ppellant presented significant, uncontroverted evidence that he has matured and made steps toward rehabilitation while in prison"). Thus, because Stewart has invoked our jurisdiction, we may proceed to address his issue on the merits.

In ***Miller***, ***supra***, the United States Supreme Court prohibited the imposition of mandatory life sentences for juvenile homicide offenders, concluding it violated the principle of proportionality inherent in the Eighth Amendment. In reaching its holding, the Court made the following insightful statement:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features [—]among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him [—]and from which he cannot usually extricate himself[—]no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth[—]for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.

***Id.*** at 2468. Thus, as a result of ***Miller***, "defendants[, like Stewart,] who committed murder as a juvenile and were imprisoned under Pennsylvania's

former mandatory LWOP sentencing scheme had to be resentenced." ***Commonwealth v. Felder***, 269 A.3d 1232, 1234 (Pa. 2022).

Later, in ***Jones***, ***supra***, the Supreme Court narrowed the holdings in ***Miller*** and ***Montgomery*** by specifically eliminating the requirement that a sentencing judge make a separate factual finding that the defendant is permanently incorrigible before imposing a LWOP sentence on a juvenile offender. ***Id.*** at 1313. In response, our Supreme Court decided ***Felder***, ***supra***, in which it further expounded upon the procedural protections afforded by our Commonwealth's constitution since ***Jones*** clarified ***Miller***. In that case, our Supreme Court "dissolve[ed] those procedural requirements in ***Batts II*** that are not constitutionally required—namely, the presumption against sentencing a juvenile homicide offender to life without parole, and the imposition on the Commonwealth of the burden of proving beyond a reasonable doubt that the juvenile is permanently incorrigible." ***Felder***, ***supra*** at 1245. ***Felder*** held that a sentencing court's authority "to impose a [LWOP] sentence on a juvenile homicide offender is circumscribed only to the extent as set forth in [section] 9721(b) [of the Sentencing Code,] and 18 Pa.C.S.A. § 1102.1,[9] and by ***Miller***'s command to 'consider the mitigating

---

[9] As a result of pre-***Miller*** decisions placing constitutional limits on sentencing juveniles convicted of serious criminal offenses, Pennsylvania's General Assembly enacted 18 Pa.C.S.A. § 1102.1, a new sentencing statute for juveniles convicted of first- and second-degree murder after June 24, 2012. Section 1102.1(a)(1) states that a juvenile convicted of first-degree murder, who was 15 years of age or older at the time of the commission of the offense,
*(Footnote Continued Next Page)*

qualities of youth.'" *Id.* at 1245. *See Jones*, *supra* at 1316 (it is incumbent upon sentencing court to invoke discretionary "procedure [that] ensures the sentencer affords individualized consideration to, among other things, the defendant's chronological age and its hallmark features").[10] A court may use the factors enumerated in section 1102.1[11] as a guide when sentencing a

_____

"shall be sentenced to a term of [LWOP], or a term of imprisonment, **the minimum of which shall be at least 35 years to life**." *Id.* (emphasis added).

Because Stewart was convicted on April 20, 2009, section 1102.1 did not apply at his sentencing. However, a trial court may use, for guidance, the factors set forth in section 1102.1(d) where a juvenile defendant has been convicted of first- or second-degree murder before June 24, 2012. *See Commonwealth v. Miller*, 275 A.3d 530 (Pa. Super. 2022), citing *Batts II*, *supra* at 458 (abrogated on other grounds). Further, where a juvenile offender was convicted of murder prior to June 24, 2012, the court must consider an earlier version of the statute, 18 Pa.C.S.A. § 1102, which sets a mandatory maximum sentence of life imprisonment. *Id.* at § 1102(a).

[10] "Sentencing in Pennsylvania is individualized and requires the trial court to fashion a sentence that is consistent with, *inter alia*, "the rehabilitative needs of the defendant[.]" *Commonwealth v. Baker*, 72 A.3d 652, 663 (Pa. Super. 2013), quoting 42 Pa.C.S.A. § 9721(b). Additionally, when sentencing to total confinement, the court must consider "the history, character, and condition of the defendant[.]" 42 Pa.C.S.A. § 9725. Finally, we review sentences with "regard for: (1) the nature and circumstances of the offense and the history and characteristics of the defendant[;] (2) the opportunity of the sentencing court to observe the defendant, including any presentence investigation[;] (3) the findings upon which the sentence was based[;] and (4) the guidelines promulgated by the commission." 42 Pa.C.S.A. § 9781(d).

[11] *See* 18 Pa.C.S.A. § 1102.1(d)(1)-(7) (factors to consider when determining whether to impose LWOP on juvenile convicted of murder include: impact of offense on each victim, including oral and written victim impact statements made or submitted by family members of victim detailing physical, psychological and economic effect of crime on victim and the victim's family; *(Footnote Continued Next Page)*

juvenile convicted pre-***Miller***.  ***See Commonwealth v. Summers***, 245 A.3d 686, 693 (Pa. Super. 2021).

At his resentencing hearing, Stewart, who was 31 years old at the time, presented the following mitigating evidence:  he has had no misconducts in prison in almost seven and one-half years,[12] he has been attending barber school, and he was scheduled to graduate with his barber's license the following week.  ***See*** N.T. Resentencing Hearing, 10/19/22, at 13.

Stewart's aunt testified that she has seen an improvement in her nephew since he has been in prison, ***id.*** at 18, that Stewart "calls [her and Stewart's mom, that she] talk[s] on the phone" with him, that Stewart "has

---

impact of offense on the community; threat to safety of public or any individual posed by defendant; nature and circumstances of offense committed by defendant; degree of defendant's culpability; sentencing and resentencing guidelines adopted by Pennsylvania Commission on Sentencing; age-related characteristics of defendant, including age, mental capacity, maturity, degree of criminal sophistication exhibited by defendant, nature and extent of any prior delinquent or criminal history (including success or failure of any previous attempts by court to rehabilitate defendant), probation or institutional reports, and other relevant factors).

[12] While incarcerated in the instant matter, but prior to his trial, Stewart received three misconducts at Dauphin County Prison for infractions incurred on August 13, 2008, and December 8, 2008.  ***Id.*** at 7.  On September 15, 2009, also while incarcerated in the instant matter, Stewart pled guilty to causing a riot and was ordered to pay $11,000.00 restitution to Dauphin County.  The DOC integrated case summary states that "Mr. Stewart and eight other inmates did conspire to riot while at Dauphin County Prison and did cause $11,000.00 damage to Dauphin County Prison."  Integrated Case Summary – Initial Classification Summary, 10/23/09, at 4.  Finally, the DOC case summary also indicates that from September 2011 to May 2015, Stewart was found guilty of six misconducts, including refusing to obey an order, being present in an unauthorized area, and possessing unauthorized items (radio).

changed for the better[]," and that Stewart, who "was caught up in a [bad] lifestyle" at the time he committed the instant crime, "has been going through the drug and alcohol treatment programs [in jail]." ***Id.*** at 18-19. Stewart's mother testified that her son murdered the victim when he was "dealing drugs and whatnot" and that she has seen "[a] whole lot" of improvements in her son since he has been incarcerated. ***Id.*** at 16.

Finally, Stewart, himself, expressed extreme remorse for his actions, apologizing to the victim's family at length and noting that, no matter what age he was at the time he committed the crime, what he did was "wrong [and that he] shouldn't have had a gun." ***See id.*** at 20-21. Stewart acknowledged that while he can never "take . . . back" what he did, he knows he "shouldn't have had [a] gun, [b]ut that . . . people taught [him those types of things] when he was growing up . . . [and] that [he] thought [he] was just doing what was right." ***Id.*** at 20. ***See also id.*** (Stewart testifying he was taught, "You shoot first and ask questions last.").

The Commonwealth presented several of the victim's family members, who testified regarding the impact that the victim's death has had on them. ***Id.*** at 8-13. The Commonwealth also pointed out at the beginning of the resentencing hearing that Stewart was "closer to the age of 18 than the low end" at the time he committed the murder, "which . . . is a factor in judging

where to set [his] minimum sentence."[13] **Id.** at 4. Finally, the Commonwealth commented on Stewart's prior juvenile record and entered a status report from the Juvenile Probation Department into the record. **Id.** at 3-5.[14]

In rendering its resentence, the court stated the following on the record:

All right. Thank you very much.

These cases involving a murder charge, a murder conviction[,] especially involving people who know each other in some way, shape, or form or are familiar with each other[,] have presented difficult problem as always.

On each side of the case, there is pain and sorrow. Understandable pain on behalf of the Davenport family, on behalf of Charles' family. They lost a son, a nephew, and so their pain will continue for a long time.

And there is pain on behalf [] Stewart's family . . . as well. Their child, their son, their nephew and so forth, he is in jail. And he will be in jail for a considerably long period of time. And that is a[—]is a hole, so to speak, in their life as well.

_____

[13] Although not directly on point, in **Commonwealth v. Johnson**, 222 A.3d 835 (Pa. Super. 2019) (Table), our Court noted that in crafting section 1102.1, the legislature made "[a] distinction between juveniles, under the age of eighteen and under the age of fifteen, [because it] recognize[d] that as juveniles age and get closer to adulthood, the starting point for assessing a degree of culpability and potential for reform must also evolve." **Id.** at *17. **See** Pa.R.A.P. 126(b)(2) (non—precedential decisions of this Court filed after May 1, 2019, may be cited for their persuasive value).

[14] As previously noted, the Commonwealth also moved to have Stewart's DOC Classification Summary and Misconduct Records included in the record for the court to use in deciding his post-sentence motions. However, as Stewart points out, **see supra** at n.5, those documents fail to reflect the positive steps he has taken to better himself over the past 13 plus years. In fact, several documents (i.e., criminal complaint and affidavit of probable cause) recount the details of the crimes themselves, rather than revealing anything about Stewart's youth and attendant circumstances at the time he committed the crimes or the efforts he has made to rehabilitate while in prison.

That is one of the tragic consequences of violence that takes place in our community. The pain is rampant on both sides of the case and all of that has to be balanced, of course.

The jury did find [Stewart] guilty of murder in the first degree and reviewing the trial record and the opinions from the Superior Court and Judge Turgeon's opinion, there was more than sufficient evidence to back up the jury's verdict[, which] found that it was a willful, deliberate, premeditated killing. It was murder in the first degree.

The facts showed that [] Stewart came up from behind the victim, from behind Charles[,] and fired into his back as Mr. Davenport, as Charles, is lying on the ground, essentially begging for his life, the Defendant stood over him and fired at least two more shots, one lodged in his torso and there was some suggestion and some evidence that the victim may have been stomped on by the Defendant and another individual after the shooting itself.

So[,] it is a horrible set of facts. **It is a terrible set of facts. Facts that clearly, clearly, clearly, undoubtedly establish premeditation necessary for first-degree murder.**

So[,] it is not difficult to understand how the jury reached that particular verdict. **So**[,] **the level of violence was high here and that is a factor.**

Obviously, **it was a firearm used by a juvenile who at the time should not have been running around with a firearm.** The defendant's age was about 17 and a half years, 17 years, 4 and a half months, I believe is what was the calculation.

But, nevertheless arguably, **old enough to know better** [**than**] **to be running around with a gun. Defendant did have a prior record but not a serious one but, nevertheless, a prior record that also has to be balanced.**

The impact upon the Davenport family, on behalf of Charles' family is quite significant. There is pain. There is heartbreak. There is heartache and, you know, I wish I could make[—]wave that magic wand and make that go away.

But let's be realistic about it[,] to Charles' family, that is never going to go away. That is going to be with you for the rest of your lives. And I wish I had some way to cure that, but it is not within my power or any civil power in this world to cure that problem.

And so it is [] easy to understand the pain and heartache that all of you feel about Charles' death.

On behalf of the Stewart family as well, again, there is the same level of pain.  They have lost a son and he is not going to be with them.  They can still visit and still see him and they can still communicate but, you know, it is [] a difficult situation for them as well and their pain is significant.   Their heartache and heartbreak is significant as well.


\*     \*     \*


And Mr. Stewart has a child.  Your child is 15.  How about Mr. Davenport's?


\*     \*     \*


All right. Well, a 14-year-old and a 15-year-old who are going through life without their fathers.  All right.

Mr. Davenport's child, okay, doesn't have a father.  His father is dead, and that child has to deal with that.

Mr. Stewart's child is 15 years of age.   He can certainly communicate with his dad; but nevertheless, his dad is in a state prison.

With a heartache and with a tragedy for both of those children, no doubt about it, they both suffer.  They both have to deal with that particular loss.  So that is another factor that has to be considered as well.

Mr. Stewart seems to be doing well in prison.   He has no misconduct, I think you said, Miss Clarkson, for the last seven years.

He is in the barber school.  He is a peer support specialist inside the jail and does have the support of his family as well.  So that is another factor that has to be considered.

**Again, it is difficult but, you know, I am**[—]**I am satisfied that the level of violence here in this case was just over the top.  It should not have happened.  It should not have occurred and I think the level of violence justifies a sentence of life in prison.**

- 18 -

So[,] I'm going to sentence Mr. Stewart to a sentence of life imprisonment for first-degree murder. The sentence is effective on June 9, 2008, and he does have credit from June 9, 2008 through today's date.

The sentence on the other charges, I don't think is under review here and whatever sentence Judge Turgeon handed down on those charges remains. I think they were to run concurrent anyway with this particular sentence. So[,] I will reemphasize that, that the sentence was [on] a firearms charge.

*Id.* at 22-25 (emphasis added).

The court's rationale for the LWOP resentence is predominately based upon the level of violence the court attributed to Stewart's actions toward the victim, *id.* at 26, including the fact that the killing was premeditated, *id.* at 23, the fact that Stewart used a firearm, *id.* at 24, that Stewart was a juvenile who was "old enough to know better" than to be "running around with a firearm," *id.*, and that Stewart had a prior record, although "not a serious one." *Id.* The majority of these factors, however, are elements of the crimes themselves. *See also* Trial Court Opinion, 3/24/23, at 5 ("While this [c]ourt acknowledges and respects that [Stewart] has made various attempts to educate himself and has made attempts to be a productive citizen in prison, **we believe that the callous and horrifying nature of the underlying facts surrounding this case,** as well as the impact that the crime had on the victim's family, **served as compelling aggravating factors weighing heavily in favor of the life-imprisonment sentence imposed by this [c]ourt**.") (emphasis added).

Recently, in **Schroat**, **supra**, our Court was faced with a defendant's challenge to the discretionary aspects of his LWOP sentence.[15] Schroat, who was convicted in 2019 of a first-degree murder that he committed at age 17, argued that the sentencing court abused its discretion by "[re]sentencing him to an excessive LWOP sentence, placing inordinate focus on the facts of the underlying offense, failing to consider relevant mitigating factors, and failing to consider evidence of his rehabilitation while in prison." **Id.** at 527.

On appeal, our Court considered the testimony of a psychiatric expert who concluded Schroat had matured in prison, despite a lack of mental health treatment, was not currently suffering from any mental health disorders, and posed a low risk to reoffend if paroled. **Id.** at 528. The expert "credited [Schroat's] brain development and maturity as the reason for [his] change." **Id.** Additionally, the expert noted that a main reason why Schroat was "very immature" at the time he committed the crime was because of his "dysfunctional [and] unhealthy home life . . . [that] was marked by neglect and abuse," sexual abuse by his adoptive father, and a "chaotic family environment." **Id.** at 528. Notably, the expert opined that the prison environment has actually been "a healthier environment for [Schroat] in the

---

[15] Schroat also challenged the legality of his sentence, claiming that the resentencing court lacked competent evidence to find him permanently incorrigible. **Id.** at 526. However, because our Supreme Court in **Jones**, **supra**, concluded that a separate factual finding of permanent incorrigibility is no longer required before a sentencer imposes a LWOP sentence on a juvenile offender convicted of first-degree murder, the Court concluded Schroat's claim goes to the court's sentencing discretion and not the legality of his sentence. **Id.**

last 25+ years than was the abusive and neglectful environment in which he lived prior to his arrest." *Id.* As a result of the positive benefits of the penal system's structure, Schroat had only incurred four "minor" misconducts during his 26 years in prison. The Commonwealth presented no contradictory evidence to prove Schroat suffers from a mental illness or that the expert's opinion was flawed.

Nevertheless, the sentencing court disagreed with the expert's conclusions that Schroat was no longer mentally ill due to his maturation in prison and that Schroat posed a low-risk to reoffend. In fact, the court concluded to the contrary, noting that "the type of sickness that drove [Schroat] to kill [the victim] did not just disappear with 'maturity' or brain development, or prison." *Id.* at 529.

In vacating Schroat's sentence and remanding for resentencing, our Court stated:

> **[T]he court gave short shrift to factors indicative of [Schroat's] history, character, condition, and rehabilitative needs[—]statutory factors it is required to consider.** *See* 42 Pa.C.S.[A.] §§ 9721(b), 9725. *See also Commonwealth v. Coulverson*, [] 34 A.3d 135, 145 (Pa. Super. 2011) ("the record as a whole must reflect due consideration by the court of the statutory considerations [enunciated in Section 9721(b)]." (citation omitted)). For example, the court summarily found that [Schroat] had "no diminished culpability" despite being a minor when he committed the crimes. It effectively dismissed Dr. Calvert's testimony about [Schroat's] childhood trauma by summarily acknowledging that he "did not have an ideal home environment." It likewise dismissed Dr. Calvert's opinion that [Schroat] lacked maturity when he committed the murder without any significant discussion or analysis.

> In total, **the court's opinion reflects a lack of consideration for [Schroat's] youth, history, and rehabilitative needs in favor of an inordinate focus on the heinous act he committed as a minor. [Schroat] presented significant, uncontroverted evidence that he has matured and made steps toward rehabilitation while in prison. Yet, in the sentencing court's view, [Schroat] has made no progress because he committed murder in 1992.** This view directly contradicts the Supreme Court's edict that "children who commit even heinous crimes are capable of change[,]" **Montgomery**, 577 U.S. at 212, is manifestly unreasonable, and an abuse of discretion.

**Schroat**, **supra** at 529-30 (emphasis added) (citations to trial court record omitted).

After a comprehensive review of the record, we conclude, much like our Court did in **Schroat**, that the trial court did not individualize Stewart's resentence. **See Commonwealth v. Machicote**, 206 A.3d 1110, 1119 (Pa. 2019)[16] ("[O]ne of the hallmarks of the line of United States Supreme Court cases pertaining to juvenile sentencing, is the notion that conviction for a specific crime does not warrant the same sentence in all circumstances."). Specifically, the court failed to adequately take into account the mitigating qualities of Stewart's youth at the time he committed the crime—a necessary and mandatory discretionary aspect of sentencing factor for any juvenile LWOP sentence post-**Miller** and its progeny. Additionally, the court failed to properly consider the significant rehabilitative steps Stewart has made over the past 13½ years in prison.

---

[16] *Abrogated on other grounds by **Felder**, **supra** at 1243 n.13.*

- 22 -

Although the court stated that it had to consider the fact that Stewart "seems to be doing well in prison[,] . . . has [had] no misconduct[s] in prison . . . for the last seven years . . . is in the barber school[,] is a peer support specialist inside the jail and does have the support of his family," the court immediately followed those statements with the conclusion that "the level of violence justifies a sentence of life in prison." *Id.* at 26. As the *Miller* Court recognized, sentencing for juveniles must be individualized and requires consideration of not only the defendant's age at the time he committed the offense, but also the "hallmark features" of youth. *Miller*, *supra* at 477-78. Moreover, as the United States Supreme Court recognized in *Jones*, *supra*, "any homicide, and particularly a homicide committed by an individual under 18, is a horrific tragedy for all involved and for all affected." *Id.* at 1322. For that reason, it is incumbent upon a sentencing court to apply a discretionary "procedure [that] ensures the sentencer affords individualized consideration to, among other things, the defendant's chronological age and its hallmark features." *Id.* at 1316.

Here, as evidenced in *Schroat*, *supra*, the court's primary basis for its resentence of LWOP is the fact that Stewart committed a heinous crime in 2008 at the age of 17—"[a] view that directly contradicts the Supreme Court's edict that 'children who commit even heinous crimes are capable of change[.]'" *See id.* at 530. Thus, we conclude the court abused its discretion in resentencing Stewart to LWOP without proper consideration of the hallmark features of Stewart's youth at the time he committed his crime and by failing

to individualize his sentence, in particular by failing to account for the significant rehabilitative efforts he has made while incarcerated. ***See Graham v. Florida***, 560 U.S. 48, 76 (2010) ("An offender's age is relevant to the Eighth Amendment, and criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed.")

Judgment of sentence vacated. Case remanded for resentencing. Jurisdiction relinquished.

Nichols, J., filed a Concurring Memorandum in which Stevens, P.J.E., joins.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 08/06/2024